**John T. HILL, et al., Plaintiffs,**

v.

**EQUITABLE BANK, National Association, Defendant.**

**Civ. A. No. 82–220 CMW.**

United States District Court, D. Delaware.

Jan. 9, 1987.

Amendment to Opinion March 2, 1987.

Steven D. Goldberg, of Theisen, Lank, Mulford & Goldberg, Wilmington, Del., of counsel: Richard I. Kovelant, and Douglas Clark Hollmann, of Goldman, Kruger, Kovelant, Hurtt, Hollmann & Kaiser of Laurel, Md., for plaintiffs.

Martin I. Lubaroff, of Richards, Layton & Finger, Wilmington, Del., of counsel: Michael D. Colglazier, and Ty Cobb, of Miles & Stockbridge, Baltimore, Md., for defendant.

## OPINION

CALEB M. WRIGHT, Senior District Judge.

### INTRODUCTION

These consolidated cases arise out of an alleged scheme to defraud plaintiffs in the purchase of interests in two limited partnerships, Wilmington House Associates ("Wilmington House"), and Eagle Associates ("Eagle").[1] Defendant Equitable Bank issued letters of credit for some of plaintiffs' investments, was involved in a meeting promoting the investment, and had significant financial dealings with the part-

---

1. The cases consolidated with *Hill v. Equitable Bank, N.A.* are *Equitable Trust v. Scott*, C.A. 84–589; *Equitable Trust v. Hill*, C.A. 84–590; *Equitable Trust v. Ruger*, C.A. 84–591; *Equitable Trust v. Descomp, Inc.*, C.A. 84–592; and *Equitable Trust v. Stritzinger*, C.A. 85–216.

nerships' organizer. This Court has already ruled on two motions to dismiss the entire complaint[2] and one motion to dismiss the Racketeer Influenced and Corrupt Organizations Act ("RICO") counts of the Second Amended Complaint.[3] Now pending before the Court is defendant's Motion for Summary Judgment on all twenty-three counts of the plaintiffs' Second Amended Complaint. For the reasons stated in the following opinion, this motion will be granted in part and denied in part.

FACTS

Plaintiffs John T. Hill, Thomas and Patricia Ruger, Virgil and Marie Scott, and Descomp, Inc., a corporation controlled and managed by Messrs. Ruger and Scott, invested in the Wilmington House Associates ("Wilmington House") limited partnership on November 11, 1977. Lee P. Der, through Lee P. Der, Inc., served as the general partner of Wilmington House. The limited partnership was formed for the purpose of acquiring and operating an apartment complex.

Defendant Equitable's role in the Wilmington House investment was to finance the plaintiffs' purchase of limited partnership interests. Under the subscription agreement for Wilmington House, plaintiffs were required either to make full payment at the outset or to make a down payment on November 11, 1977 and to make installment payments on May 1, 1978, February 1, 1979, February 1, 1980 and February 1, 1981.[4] If an investor chose to pay in installments, he was required to secure the payments by irrevocable, negotiable letters of credit issued by a commercial bank acceptable to the general partners. Opening, Ex. A, p. 22. If an investor failed to make the required payment, the bank would make the payment pursuant to the letters of credit. The defaulting investor would then be personally liable to the bank for the missed payment. *Id.* at 23. Equitable issued letters of credit to the plaintiffs to secure their purchases of Wilmington House limited partnership interests. Plaintiffs, however, had no direct contact with any Equitable official or employee; instead, plaintiffs applied for the letters of credit through Der.

Approximately one year later, in November of 1978, plaintiffs Thomas Ruger, Virgil and Marie Scott, James Stritzinger, and Data Controls North, Inc., a corporation controlled by Ruger and Scott, invested in Eagle Associates ("Eagle"). Eagle was formed as the resyndication of Alma Coal Properties Ltd. ("Alma") and was to be engaged in the coal mining business in West Virginia. Although the businesses of Eagle and Wilmington House were quite different, the method of payment for investors was similar. The Eagle investors also had the option to pay in installments secured by an irrevocable letter of credit. Opening, Ex. C, p. 6. Equitable agreed to finance Stritzinger's purchase of an interest in Eagle; however, the bank declined to finance the purchase of the remaining plaintiffs. Consequently, the remaining plaintiffs paid the balance in January, 1979 on the purchase price for their Eagle interests but characterized these payments as loans to Eagle as security for their future installment payments. In any event, the

---

**2.** 562 F.Supp. 1324 (D.Del.1983) (*"Hill I"*), and 599 F.Supp. 1062 (D.Del.1984) (*"Hill II"*).

**3.** 642 F.Supp. 1013 (D.Del.1986) (*"Hill III"*). The RICO conspiracy count based on the Wilmington House investment was dismissed in *Hill III*.

**4.** The parties submitted extensive factual documents in support of their memoranda in support of and in opposition to the summary judgment motion. These submissions include excerpts from deposition testimony, interrogatory answers, documents produced in discovery, and the documents relevant to the formation of each limited partnership. Citation to these submissions will be in the following manner: Documents submitted in support of defendant's memorandum in support of its motion for summary judgment will be cited as Opening, Ex. ——; documents submitted in support of plaintiffs' answering memorandum will be cited as Answering, Ex. ——; and those submitted in support of defendant's reply memorandum will be cited as Reply, Ex. ——. For example, the Wilmington House Subscription Agreement which sets out the payment schedule is Exhibit B of the factual submissions to defendant's opening memorandum and will be cited as Opening, Ex. B. The memoranda themselves will be cited as Opening, Answering and Reply.

plaintiffs were bound to make the installment payments. Whether these future payments were fully "secured" by the "loans" or by an irrevocable letter of credit, the Eagle partnership could be sure that the money due it would be received.

Problems with these investments led to this suit. Troubles for Wilmington House began with a fire in the boiler room at Lancaster Court on December 9, 1977.[5] The venture suffered financial difficulty, and, in January 1979, Lancaster Court Associates filed for bankruptcy. Plaintiffs first learned of this bankruptcy not from Der or the other principals in Wilmington House but from a third party not involved in the investment. Reply, Ex. 5, pp. 520–521. In April of 1979, plaintiffs received their K–1 tax forms for Wilmington House and discovered that the losses for 1978 were twice what Der and the other organizers had indicated they would be.

At about the same time that the Wilmington House investment was falling apart, the Eagle partnership was suffering problems of its own. The K–1 form plaintiffs received for Eagle also indicated losses greater than had been represented. In May and June of 1979, the Eagle partnership shifted from owning and operating its own mine to contract mining. Plaintiffs were told that this change was necessitated by new Environmental Protection Agency regulations which rendered the coal in the mine Eagle owned unmarketable.

In 1980, plaintiffs sued Der and the other principal organizers involved in the two partnerships. *Hill v. Der*, C.A. 80–146.[6] Plaintiffs did not sue Equitable for its involvement in these investments until April 1982. Filing of the suit against Equitable resulted from a conversation between Mr. Mason, one of the principals along with Der, and Thomas Ruger, in which Mason told Ruger that Stephen Meszaros, a Vice President of Equitable, had received kickbacks in exchange for arranging the financing for Wilmington House. Prior to this telephone conversation, plaintiffs began to inquire about Equitable's role in the Eagle and Wilmington House investments. These inquiries included letters to the bank and letters to both state and federal bank regulating bodies. Answering, Ex. 31. None of these inquiries proved fruitful for plaintiffs. As will be discussed more fully below, plaintiffs contend that they could not have discovered Equitable's involvement in the alleged federal securities violation and common law fraud prior to the conversations between Mason and Ruger.

The substance of plaintiffs' claims revolves around a meeting held on November 6, 1978. Present at the meeting were Der, Meszaros, plaintiffs Ruger and Scott, and R. Kenneth Rous, a vice-president of Equitable. According to Ruger and Scott, Rous misrepresented to them the soundness of the Eagle investment, the extent of Equitable's involvement with Eagle organizers, and the honesty of Der.[7]

In *Hill II*, the court held that the bank was potentially liable for failure to disclose facts relating to the misrepresentations Rous made. The facts Rous failed to disclose that related to his representations included those concerning the creation of the Eagle partnership. Eagle represented the resyndication of a prior limited partnership, Alma Properties, that was also a Der syndication. Equitable had issued an irrevocable letter of credit to Richard Ward, the only limited partner in Alma, to finance his investment in Alma. Equitable also had loans outstanding to the Alma partnership and its operating subsidiary, Manila Mining. Problems arose in the Alma partnership, and Ward refused to make the installment payments that were coming due. Ward also went to court to enjoin Equitable

---

**5.** This fire occurred soon after Lancaster Court Associates purchased the apartment complex. Wilmington House was created to be the sole limited partner in Lancaster Court Associates, and any problems Lancaster Court Associates faced directly affected the limited partners in Wilmington House. *See* Opening at 1–2.

**6.** Even though *Hill v. Der* was filed prior to the instant case, *Hill v. Der* has been stayed pending resolution of this case.

**7.** The extent of Rous' alleged misrepresentations is set out in Ruger's answers to interrogatories. Opening Ex. E, pp. 4–5. This answer is cited in full, *infra*.

from paying Alma on the letter of credit. *See* Answering, Ex. 37.

Ward's refusal to pay placed Alma in a precarious financial position. Ward's refusal also meant that Alma would not be able to repay its Equitable loans. Representatives of Alma, including Der, and Rous, as a representative of Equitable, held a meeting on August 18, 1978, to find a solution to these problems. The solution arrived at was a resyndication of Alma into another limited partnership, Eagle. Investments into this new limited partnership would in part be used to pay off the debts Alma owed to Equitable. In addition to this resyndication, the lawsuit filed by Ward against the bank and Alma was settled. When Rous represented to plaintiffs that the Eagle investment was sound, he did not inform them of the amount of money Der and Alma owed the bank or of the settlement of the Ward lawsuit.

Plaintiffs also learned that Mr. Meszaros had been asked to leave Equitable because he was too closely involved with Der. Answering, Exs. 33–34. That involvement included trips that Der and Meszaros took together. Meszaros was the Equitable officer who approved the Wilmington House loans. At the time of the November 6th meeting, Meszaros was working with Der and not Equitable, but he may still have been receiving compensation from Equitable. At the time of the November 6th meeting, plaintiffs were not informed of any potential impropriety in Meszaros' relationship with Der.

## SUMMARY JUDGMENT

This Court has already issued three opinions on whether or not plaintiffs' claims are viable as pled. Now, after over four years, the Court has extensive factual submissions on which it can determine what counts should be dismissed and what counts should go before a jury at trial. The moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). No genuine issue of material fact exists if the Court, after resolving all factual disputes having a colorable foundation in the evidentiary record in favor of the non-moving party, finds that the moving party still is entitled to judgment as a matter of law. *See Goodman v. Mead Johnson & Co.*, 534 F.2d 566 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Although disputes are resolved in favor of the non-moving party, the non-moving party must present to the Court facts which refute the version of facts presented by the moving party.

Defendant has moved for summary judgment on two basic grounds. First, defendant argues that plaintiffs' claims are all barred by the statutes of limitations. Second, even if plaintiffs' claims are not time barred, defendant argues that it is entitled to summary judgment on the merits for all twenty-three counts. Plaintiffs' twenty-three count complaint can be divided into three general areas: federal securities law claims under the anti-fraud provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934; common law claims for fraud; negligent misrepresentation and negligence; and civil racketeering claims under RICO.[8]

## STATUTE OF LIMITATIONS

■ In *Hill I* and *Hill II*, this Court ruled upon the appropriate limitations period to be applied to plaintiffs' federal securities claims. *Hill I*, 562 F.Supp. at 1336–1339; *Hill II*, 599 F.Supp. at 1072. The limitations period applicable to plaintiffs' claim under § 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder are the applicable state statutes of limitations. For plaintiffs Hill, Stritzinger and Descomp, Inc. the appropriate statute of limitations is the three year limitations period set forth in 10 *Del.C.* § 8106. The one

---

**8.** Counts 1 through 15, 21 and 22 refer to the Eagle investment. Counts 16 through 20 and 23 refer to Wilmington House.

year Maryland limitations period applies for the other plaintiffs' claims. Md.Corps. & Assn.Code Ann. § 11–703(f). Although state law determines the applicable statute of limitations, federal law determines when the limitations period begins to run. *Hill v. Der*, 521 F.Supp. 1370, 1387 (D.Del.1981). If the statute of limitations began to run when plaintiffs signed the partnership agreements, then all their claims would be time barred. Plaintiffs, however, have raised two reasons for tolling the running of the statute of limitations: the investment decision doctrine and equitable tolling.

*A. Investment Decision Doctrine*

█ A 10b–5 cause of action accrues on the date that the purchase or sale of securities occurred. *Hill II*, 599 F.Supp. at 1072. This generally means that the cause of action accrues on the date that a party enters into a binding agreement to buy or sell securities. *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890–91 (2d Cir.1972). If, however, a party enters into an agreement to purchase securities into the future but the party possesses the power to terminate the agreement, the party may be viewed as making a new investment decision on each occasion that the party invests additional money. Each such investment decision may be viewed as a new purchase or sale; therefore, a new cause of action accrues at the payment of each installment. *See Goodman v. Epstein*, 582 F.2d 388, 409–14 (7th Cir.1978), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). Because plaintiffs paid for their limited partnership shares in installments, the question arises as to whether or not the investment decision doctrine of *Goodman* should apply.

█ On close examination of the documents relevant to the formation of the two partnerships,[9] the Court finds that the investment decision doctrine does not apply. In Wilmington House, the Rugers, the Scotts, Hill and Descomp all purchased limited partnership interests through the execution of subscription agreements on November 11, 1977. The investors chose to make installment payments over time instead of paying the full price of a partnership interest. These payments, however, were not discretionary. Definite amounts of money were due on definite dates into the future. Opening, Ex. B, p. 5. Moreover, each of these payments had to be secured by an irrevocable letter of credit from a commercial bank. Thus, if plaintiff defaulted on a payment, the partnership could turn to the bank for payment, and the limited partner "may be personally liable to the Bank." Opening, Ex. A, pp. 22–23. The installment payments were secured by irrevocable letters of credit issued by Equitable. The Eagle agreement also required investors who chose to pay in installments to make definite payments on definite dates in the future. James Stritzinger financed his Eagle investment with an Equitable letter of credit. The other Eagle investors paid the remainder of their investment in January of 1979 in the form of loans to the partnership which were subsequently offset against the installment payments as the installments became due. *Hill II*, 599 F.Supp. at 1068.[10]

The factual situation in this case is radically different from that in *Goodman v. Epstein, supra*. In *Goodman*, the future payments requested from the limited partnership's investors were made on uncertain dates and for uncertain amounts, based upon requests from the general partner. The *Goodman* court held that this allowed the investors to make a discretionary determination of whether or not to continue to invest; thus, each further investment constituted a purchase or sale of securities.

9. Opening, Ex. A, B, C, G, and L.

10. Because the Court finds that the investment decision doctrine does not apply to any of the plaintiffs' investment, any distinction between the investments secured through Equitable letters of credit and those secured by direct loans from plaintiffs to the partnership is unimportant. All the installments on both investments were paid. For those installment payments financed through loans from plaintiffs to the partnership, the payments were little more than paper transactions in which monies due the plaintiffs under the loans were offset against monies the plaintiffs owed the partnership.

*Goodman,* 582 F.2d at 413. It therefore follows that any fraud prior to the new investment could be viewed as a fraud in connection with a purchase or sale of securities. *Id.* By contrast, as described above, the Wilmington House and Eagle investors were committed to making all the future payments. Nothing they were told or not told could affect their decision to make the installment payments for the plain fact that the plaintiffs had no decision to make. When each installment came due, plaintiffs were not deciding to invest again; instead, they were merely paying for an already existing investment.

Just as in *Radiation Dynamics, Inc. v. Goldmuntz,* 464 F.2d 876 (2d Cir.1972), the plaintiffs in this case entered into a binding commitment to purchase the limited partnership interest. The purchase or sale occurs on the date that the parties entered into that "binding commitment." *Id.* at 890–891. The facts in the instant case are almost identical to those in *Stewart v. Germany,* 631 F.Supp. 236 (S.D.Miss.1986). The *Stewart* court relied on the fact that plaintiff was obligated to meet cash calls in order to protect her partnership interests; that plaintiff remained liable in the event of non-payment; and that payments did not create a new interest. *See Ingenito v. Bermec Corp.,* 376 F.Supp. 1154 (S.D.N.Y. 1974) (distinguishing between payments to protect an already existing interest and payments that created a new interest). In both Eagle and Wilmington House, investors had to make payments in the future on definite dates to maintain their partnership interest. Failure to do so resulted in the forfeiture of the partnership interest; however, the investor remained liable for the payments due the partnerships.

Plaintiffs contend that the options available to them under the partnership agreements create the necessary discretion to apply the *Goodman* doctrine to the instant case. Under the Wilmington House Limited Partnership Agreement, the limited partners can terminate the partnership upon the "decision of the partners owning at least 66⅔% of the aggregate partnership interest of all partners." Answering, Ex. 3, p. 2. Similarly, the Eagle partnership could be terminated upon the vote of 80% of the partners. Answering, Ex. 4, p. 2. Plaintiffs argue that this power of termination gave them the power to terminate their obligations under the agreements; therefore, their failure to exercise this power meant that each installment constituted a new investment decision.

In *Hill II,* the Court accepted plaintiffs' argument that the powers in the agreement meant that the investment decision doctrine potentially applied. "Whether plaintiffs state a claim under the investment decision doctrine is, therefore, a factual issue that may not be determined by the Court on the present motion to dismiss." 599 F.Supp. at 1074. Now before the Court are sufficient, undisputed facts to hold that these options did not create an investment decision for the plaintiffs.

No single limited partner could pull out of his commitment. If all the other limited partners chose to continue the partnership, no single limited partner could make an independent investment decision to cease investing. Plaintiffs contend that, for Wilmington House, plaintiffs owned sufficient shares to terminate the partnership. This is only true for plaintiffs as a group; however, the fact remains for Wilmington House as well as Eagle that no individual limited partner could escape from the investment contracts.

A second reason that plaintiffs' options do not create decisions is that the options available to plaintiffs assume that they already owned the full partnership interest. The distinction made between two kinds of investments in *Ingenito v. Bermec,* 376 F.Supp. 1154 (S.D.N.Y.1974), is significant here. In *Ingenito,* the court distinguished between payments made on a maintenance contract and those made on a promissory note. The payments made on the maintenance contract increased the investor's equity by improving the quality of the investment while the payments on the promissory note did not increase their interests. 376 F.Supp. at 1184. Because of this distinction, the court held that each payment on the maintenance contract constituted an investment decision but that the promisso-

ry note payments were not separate investment decisions.

The payments at issue in the instant case are substantially identical to the payments made on the promissory note in *Ingenito.* The agreements plaintiffs signed when they entered the partnership gave the plaintiffs the full limited partnership interests. Their right to terminate the partnership represented a right they had as full limited partners. These interests did not increase with each subsequent payment; indeed, plaintiffs' rights at the outset of the agreement were identical to their rights when plaintiffs made final payment. Because the ownership interest fully vested at the time of the agreement, the right to dissolution is in reality no different from a right to sell the shares. In *Hill II,* this Court held that the option to sell shares or rescind the contract of sale did not constitute options to which the investment decision doctrine applies. 599 F.Supp. at 1073, n. 11. After seeing the agreements involved in this case, the Court holds that the option to terminate the Eagle and Wilmington House partnerships were analogous to a sale or a recission and did not transform each installment payment into an investment decision.[11]

Finally, plaintiffs own testimony indicates that plaintiffs did not believe that they possessed any options. Ruger testified that he knew of no options to making his 1980 Wilmington House payment. Opening, Ex. H, pp. 236, 239. He also testified that he was not sure if the 1980 Eagle payment had been made, but he assumed that it had. Opening, Ex. I, p. 617. Scott's testimony followed similar lines. Opening, Ex. J, pp. 89, 90, 149, 150. In short, plaintiffs have offered no testimony to refute the plain meaning of the agreements. The agreements unequivocally create binding obligations on the plaintiffs to make the future payments. There remains no issue of fact with respect to the investment decision question, and the Court holds as a matter of law that the investment decision doctrine is inapplicable to plaintiffs' investment in Eagle or Wilmington House.

## B. Equitable Tolling

Because the investment decision doctrine does not apply, the securities causes of action accrued when plaintiffs bound themselves. The Wilmington House counts accrued in November of 1977, and the Eagle counts accrued in November and December of 1978.[12] If the investment decision doctrine were the only grounds to stop the running of the statutes of limitations, this Court could grant summary judgment to defendant on all counts. However, the doctrine of equitable tolling will allow the plaintiffs to survive the statute of limitations ground to the summary judgment motion for most of their claims.[13]

■■■ Even though the cause of action accrued on the dates that the agreements were signed, the federal doctrine of equitable tolling stops the running of the statute of limitations on a fraud cause of action if the plaintiff, "remains in ignorance of [the fraud] without any fault or lack of diligence on his part." *Holmberg v. Armbrecht,* 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946). This doctrine was explained in *Hill II:*

11. Plaintiffs contend that their statutory right to dissolve the partnership also creates an investment decision. Md.Corp. & Assn.Code Ann. § 10-801. This right, like the right to dissolution given in the agreement, implies a full ownership interest. Thus, the statutory right to dissolution does not create an investment decision. It is unclear from *Goodman* the extent to which that court relied on the partners' statutory right to dissolution. 582 F.2d at 413. In *Hill II,* this Court noted that it was not reading the investment decision doctrine as broadly as it had been read in *Goodman.* 599 F.Supp. at 1073, n. 11. The statutory right to dissolution is analogous to

a common law right of recission because, in both cases, plaintiffs' right to terminate the purchase would be the same whether the full cost was paid up front or the cost was paid over time.

12. Stritzinger invested later than the other plaintiffs.

13. As will be discussed *infra,* some of plaintiffs' counts are founded on securities laws with absolute limits regardless of equitable tolling. Those claims will be dismissed.

[O]nce a plaintiff becomes aware or should have been aware of sufficient "storm warnings" of fraud to place the plaintiff on "inquiry notice", the plaintiff must exercise reasonable diligence in investigating the cause of action for fraud. *See e.g., Buder v. Merrill Lynch, Pierce, Fenner & Smith,* 644 F.2d 690, 692–93 (8th Cir.1981); *Cook v. Avien, Inc.,* 573 F.2d 685, 696 (1st Cir.1978). The statute of limitations begins to run once the plaintiff is aware of, or should have been aware of, enough facts pointing to fraud that the possibility of fraud is, or should have been, apparent. 599 F.Supp. at 1071–77 (footnote omitted).

Determining when the plaintiffs should have known about the fraud is a highly fact-based determination. In making this determination, the Court must answer two basic questions: (1) when did the plaintiffs know enough to excite further inquiry; and (2) once plaintiffs knew enough to excite inquiry, was the investigation plaintiff undertook to uncover the fraud reasonable? *See Sleeper v. Kidder Peabody & Co., Inc.,* 480 F.Supp. 1264 (D.Mass.1979), *aff'd,* 627 F.2d 1088 (1st Cir.1980). Although there have been cases in which a court has granted summary judgment on the equitable tolling question, a court should be certain that it can rule, as a matter of law, that, given the undisputed facts, plaintiffs should have discovered the fraud sooner. A determination that investigation by a plaintiff was unreasonable as a matter of law requires a clear case of failure to investigate, because "[t]he question of what a reasonably prudent investor should have known is particularly suited to a jury determination." *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873 (9th Cir.1984), *cert. denied,* 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984). *See also, Johns Hopkins University v. Hutton,* 422 F.2d 1124, 1131 (4th Cir.1970), *cert. denied,* 416 U.S. 916, 94 S.Ct. 1622, 40 L.Ed.2d 118 (1974) ("It is sufficient for us to say that when, as here, a jury has been demanded and the facts give rise to conflicting inferences on the issue of reasonable diligence, the question must be submitted to the jury.").

The first step in assessing the reasonableness of plaintiffs' actions in uncovering the fraud is to assess plaintiffs' relationship with defendant prior to investing. This is important because the more involved Equitable was in plaintiffs' decisions to invest, the more likely it is that plaintiffs should turn to Equitable when the investments began to sour. Plaintiffs' involvement with Equitable prior to the Wilmington House investment was non-existent. Equitable financed the purchases, but the letters of credit were processed through Der.

The major involvement between the plaintiffs and Equitable occurred at a meeting on November 6, 1978 concerning the Eagle investment. The facts of this meeting are vital to the determination of both the equitable tolling and the merits issues. The facts of what was actually said at that meeting and the purpose for the meeting are in dispute. For the purposes of the summary judgment motion, the Court will accept the deposition testimony and interrogatory responses of plaintiffs as representing the true version of what happened at that meeting.

The November 6th meeting was attended by Der, Mason, Meszaros, Ruger, Scott and R. Kenneth Rous, a Vice-President of Equitable. Plaintiffs Ruger and Scott sought the meeting because, according to Ruger, "a bank loaning money to any venture puts a certain stamp of approval on it." Opening, Ex. 17, p. 333. In Ruger's answer to interrogatories, he describes Rous' involvement in the November 6, 1978 meeting in the following fashion:

On November 6, 1978, Ruger and Scott met in Baltimore, Maryland to discuss their participation in Eagle with Martin Mason, Lee Der and Kenneth Rous. Rous was introduced as a Vice President of Equitable at this meeting and indicated that there would be no problem in financing the Plaintiffs Ruger, Scott and their corporation's investment in Eagle. Rous stated in the course of a discussion: (1) that he had reviewed the Eagle PPM; (2) that he was familiar with the investment; (3) that Der was a major syndicator of tax shelter investments and that

he (Rous) was aware of Equitable's loans to Der's prior syndications; (4) that the Eagle PPM was accurate and that the Bank, based on Der's previous syndications and Eagle's loan performance, would loan the new Eagle partnership money for mining equipment and it would loan money to Eagle investors; (5) that Ruger, Scott, Data Controls North, Inc. and Descomp would have no problem receiving a loan for their investment; (6) that Data Controls North, Inc. and Descomp should establish a customer relationship (which was done by the deposit on or about November 9, 1978, of $100,000.00); and (7) that Ruger, Scott, Data Controls North, Inc. and Descomp should provide current financial statements which they did on or about November 9, 1978.

Opening, Ex. E, pp. 4–5.

Despite Rous' assertions that plaintiffs could receive financing, Ruger and Scott were denied the loans. Der told Ruger that he and Scott were denied financing because they had already received loans on Wilmington House. Answering, Ex. 13, pp. 547–48, 552–53, 575, 576. Neither Ruger nor Scott went to Rous or the bank directly to find out why their loan applications were denied. This explanation could have been plausible to plaintiffs given the fact that Stritzinger, the plaintiff who had not invested in Wilmington House, received financing from Equitable. Determining whether or not plaintiffs' response was reasonable is not determinable as a matter of law; instead, the conclusion is the type that should be made by the finder of fact.

A similar conclusion follows from the other events that eventually led to the filing of both *Hill v. Der* and this lawsuit. Whether the events are examined jointly or individually, plaintiffs have presented at least a reasonable inference that an investor would not have been placed on inquiry notice of the fraud. The core of plaintiffs' argument, that applies to virtually all the events that defendant argues should have put plaintiffs on notice of the possibility of fraud, is that the events in issue relate to Der's and the other principals' fraudulent acts, not Equitable's. The problem that

arose in the investments, plaintiffs argue, would not point to Equitable's involvement in the fraud. Instead, plaintiffs contend that the failure of the investments to be as sound as represented or their eventual suspicions about Der simply led them to believe that Equitable, just like the plaintiffs, had been defrauded.

The first event which may have led plaintiffs to question their investments was the declaration of bankruptcy by Lancaster Court Associates in January 1979. Plaintiffs did not learn of this from Der or the other principals but from an unrelated third party. Opening, Ex. E, p. 101. Scott and Ruger received from Der and other principals, explanations for the bankruptcy that appeared satisfactory. *Id.* In April 1979, the Wilmington House plaintiffs received their K–1 partnership income statements that reflected losses twice the quantity that Der had represented they would be. Plaintiffs spoke to Der, who told them that he as well as plaintiffs had been lied to by another of the principals in Wilmington House. Answering, Ex. 19, p. 25.

Also in April, the Eagle plaintiffs received their K–1 statement which reflected losses greater than those projected in the Eagle private placement memorandum. Plaintiffs were again satisfied with Der's explanation for the size of the losses. In May and June 1979, plaintiffs were notified that Eagle would switch to contract mining because of new Environmental Protection Agency regulations. The last major event prior to the filing of *Hill v. Der* was that plaintiffs learned that Der knew, at the time that Wilmington House was being syndicated, that Marcus Greenfield, one of the principals in Lancaster Associates, Inc., was bankrupt. Answering Ex. 23, pp. 198–199.

Defendant contends that these various events should have put plaintiffs on notice that Equitable may have been involved in the fraud. Defendant bases its argument on the misrepresentations plaintiffs claim defendant made. First, defendant's misrepresentation about the soundness of Eagle, and implicitly about the soundness of

Wilmington House, should have led plaintiffs back to Equitable when the investments soured. Second, any dishonesty by Der should have also led the plaintiffs back to Equitable because Equitable's view of Der's honesty was supposedly important to plaintiffs. If, as plaintiffs argue in the merits portion of their memorandum, the bank's view of Der and the investments were important, then defendant argues that when the bank's representations proved false, plaintiffs should have inquired of Equitable as to what happened. There thus appears to be an inherent contradiction when plaintiffs' equitable tolling and merits arguments are considered simultaneously.

The plaintiffs have offered a possible factual scenario to resolve the contradiction. As discussed above, plaintiffs argue that any misrepresentations Rous made at that meeting were viewed by plaintiffs as the innocent misrepresentations of another duped party. Plaintiffs argue that it was reasonable for them to rely on the bank even though they did not question the bank when the investments started to fail. Defendant contends that such a scenario strains credibility. Whether or not defendant is right, however, the facts as presented create at least the permissible inference that plaintiffs acted as claimed. The Court, therefore, cannot rule as a matter of law that plaintiffs were on inquiry notice of Equitable's fraud at the same time that they were on inquiry notice of Der's fraud.

This Court ruled in *Hill II* that plaintiffs were on inquiry notice of fraud on the part of Equitable at least by April 1, 1980 when plaintiffs filed suit in *Hill v. Der.* 599 F.Supp. at 1077. The facts that led the plaintiffs to file suit in *Hill v. Der* also should have led them to inquire into the role of all the parties involved in the two partnership investments. For example, in *General Builders Supply Co. v. River Hill Coal,* 796 F.2d 8 (1st Cir.1986), the Court held that even if the plaintiffs had not known of the defendant-fiduciary's personal stake in the venture, the plaintiffs

should have known that the representations of defendant put defendant's own reputation on the line. Similarly, even though plaintiffs did not know exactly the extent to which Equitable was involved with Der, at the very least, Equitable's reputation was on the line after Rous' representations. Once plaintiffs saw enough problems with their investments to sue Der, they should have begun to inquire about the bank's involvement.[14]

■■■■ The Court then must answer the second of the equitable tolling questions: Once the plaintiffs were on inquiry notice, were the plaintiffs reasonably diligent in uncovering the fraud? *Sleeper,* 480 F.Supp. 1264 (D.Mass.1979). Securities plaintiffs are under a duty of "reasonable care and diligence in seeking to learn the facts which would disclose fraud," *Morgan v. Koch,* 419 F.2d 993, 997 (7th Cir.1969), and mere unawareness of law or fact will not justify a lack of reasonable diligence. *Hupp v. Gray,* 500 F.2d 993, 996 (7th Cir. 1974). Plaintiffs bear the burden of coming forward with specific examples of their attempts to uncover the fraud. Plaintiffs cite to their inquiries of Der and Equitable, discovery undertaken in *Hill v. Der,* and the letters of inquiry written to Equitable and bank regulators as evidence of reasonable diligence. As with inquiry notice, the Court holds that the facts construed in the light most favorable to plaintiffs at least permit the inference that plaintiffs acted with reasonable diligence concerning the fraud.

Plaintiffs inquiries of Der and Equitable, standing alone, are insufficient to constitute reasonable diligence. For example, in *Militsky v. Merrill Lynch, Pierce, Fenner & Smith,* 540 F.Supp. 783 (N.D.Ohio 1980), the court held that plaintiffs could not solely rely on their questioning of the defendants as evidence of reasonable diligence. At some point, as in *Militsky,* the plaintiffs must go beyond simply inquiring of the wrongdoing parties. *See also Koke v. Sti-*

---

**14.** Some cases do rule as a matter of law that a party is on inquiry notice of fraud. *See, e.g., Buder v. Merrill Lynch, Pierce, Fenner & Smith,* 644 F.2d 690 (8th Cir.1981); *Sleeper v. Kidder Peabody,* 480 F.Supp. 1264 (D.Mass.1979).

*fel, Nicolaus & Co., Inc.*, 620 F.2d 1340, 1342 (8th Cir.1980); *Adams v. Martyn*, 639 F.Supp. 374 (E.D.Pa.1986). As with the question of inquiry notice, however, the complicated nature of the fraudulent involvement of Equitable is a mitigating factor. Unlike many other cases, plaintiffs' examination of Eagle's or Alma's financial records would not reveal the extent of Equitable's involvement thus making it more difficult for plaintiffs to uncover the fraud.

■ Nevertheless, the plaintiffs went beyond simply inquiring of the defrauding parties. As set out in plaintiffs' memorandum, plaintiffs requested inquiries by both the State Banking Commissioner and the Federal Deposit Insurance Corporation. The letters to these banking commissions, their responses and the responses from Equitable to the bank regulators' inquiries represent more than a simple denial to general inquiries. *See* Answering, Ex. 31. Plaintiffs attempt to involve the regulators in their investigation is a significant step beyond inquiries to the parties involved. The Court does not believe that it can rule as a matter of law that it was unreasonable for plaintiffs to rely on the decision of the banking regulators not to pursue the matter. The reasonableness of plaintiffs' decision not to follow the regulators' advice and seek help from professionals should also be decided by a jury.[15] Plaintiffs were not on inquiry notice until the filing of *Hill v. Der*, and plaintiffs acted with reasonable diligence in attempting to uncover the fraud up until the time of actual notice in 1982. As a result, the statute of limita-

tions on the bulk of plaintiffs' claims did not begin to run until March of 1982.

## C. Statute of Limitations Summary

This Court holds that the investment decision doctrine is inapplicable to this case but that plaintiffs are, for the purposes of summary judgment, entitled to equitable tolling of the statutes of limitations. This means that the causes of action accrued in 1977 and 1978 but the running of the statute of limitations was tolled until 1982 when plaintiffs learned of the Meszaros kickbacks.

As discussed in *Hill II*, plaintiffs' claims brought under §§ 12(2) and 15 of the Securities Act of 1933 are governed by the absolute, three year statute of limitations of § 13 of the Securities Act. 599 F.Supp. at 1078. Because these claims were not brought within three years of the date on which the cause of action accrued, summary judgment is granted for defendant on the §§ 12(2) and 15 claims.[16] The Court will not grant summary judgment based on statutes of limitations for any other claims.[17]

## MERITS

With respect to the statute of limitations issues, the Wilmington House and Eagle plaintiffs could be considered interchangeably; however, for the purposes of the actual substance of plaintiffs' claim dramatic distinctions emerge. These distinctions result from this Court's holding that the investment decision doctrine does not apply.

---

**15.** The Court agrees with defendant that plaintiffs cannot rely on their discovery in *Hill v. Der* as evidence of diligence. Apparently for strategic reasons, plaintiffs in that case chose not to pursue formal discovery against Der for almost two years. It was only upon beginning to pursue that discovery and on seeking document production from Mason that plaintiffs learned about Equitable's involvement in the Eagle resyndication. Such reliance on counsel in establishing strategy should not satisfy a plaintiff's duty of reasonable diligence. *Cf. Dimetry v. Department of U.S. Army*, 637 F.Supp. 269 (E.D. N.C.1985). In fact, plaintiffs leisurely taken discovery in *Hill v. Der* may work against their reasonable diligence claim at trial.

**16.** Counts 11, 15, and 19.

**17.** Defendant submitted a time barred claims chart in both its Opening and Reply Memoranda. Defendant contends in that chart that if the Court denies application of the investment decision but accepts plaintiffs' equitable tolling arguments then, *inter alia*, Ruger's and Scott's § 10(b) and 10b–5 claims are barred. The one year Maryland statute of limitations applies to Ruger and Scott. Assuming that equitable tolling tolled the running of the limitations period until March of 1982, filing the lawsuit in April of 1982 was timely. Defendant's time barred chart is incorrect in this regard.

## A. *Wilmington House*

### 1. *Securities Claims*

This Court held in *Hill II* that any liability that Equitable may face for Wilmington House arose from the misrepresentations made at the November 6, 1978 meeting. Even though these misrepresentations were explicitly about Eagle, the Court held that it could not, as a matter of law, rule that the misrepresentations did not implicitly bear on the Wilmington House investment. 599 F.Supp. at 1082. Any duty to disclose arose from the misrepresentations made at that meeting.[18]

■ In Count 16, plaintiffs allege a § 10(b) and Rule 10b–5 violation by Equitable with respect to the Wilmington House securities. The Court will grant summary judgment to defendant with respect to Count 16 because plaintiffs cannot demonstrate a causal connection between the purchase of the securities and the misrepresentations. *See SEC v. Texas Gulf Sulphur*, 401 F.2d 833, 860 (2d Cir.1968), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Because the purchase was made in November 1977 and the misrepresentations occurred about one year later, plaintiffs could not have relied on the misrepresentations in making the purchase. In order to satisfy the requirement that the purchase or sale was made in connection with the misrepresentations, the misrepresentations must occur prior to or contemporaneous with the purchase or sale. *DuPont v. Wyly*, 61 F.R.D. 615 (D.Del.1973); *Halperin v. Edwards & Hanly*, 430 F.Supp. 121 (E.D.N.Y.1977). Mere retention of securities because of a misrepresentation does not satisfy the purchase or sale requirement. *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

Count 17 alleges that Equitable conspired with the *Hill v. Der*, Wilmington House defendants to violate § 10(b), and Count 18 charges Equitable with aiding and abetting the principal's securities violations. In the briefs, the parties do not distinguish between the conspiracy and aiding and abetting claims brought with respect to Wilmington House and those brought with respect to Eagle. In light of the Court's holding, *supra*, that the full purchase of the Wilmington House interest occurred on November 11, 1977, the only facts that can be considered in either a charge of conspiracy or aiding and abetting are those that occurred prior to November 11, 1977, under the same rationale that applies to primary liability in Count 16. Thus, some of the facts which can be considered for the Eagle aiding and abetting and conspiracy counts cannot be considered for the Wilmington House counts.

■ In order to prove aiding and abetting liability, a plaintiff must show an underlying securities violation; knowledge of the aider and abettor; and knowing and substantial participation in the wrongdoing by the aider and abettor. *Metge v. Baehler*, 762 F.2d 621 (8th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). As will be set out in the Eagle section, *supra*, the bulk of plaintiffs factual submissions describing the Equitable-Der relationship revolve around events in 1978. Prior to November 1977, all plaintiffs point to is the alleged kickbacks given to Meszaros. The actual facts relating to these kickbacks are somewhat vague and do not present evidence of knowing substantial participation by Equitable. Answering, Ex. 39. Plaintiffs do not present evidence linking the kickbacks received by Meszaros to the fraud, nor do they present any evidence that Equitable knew of undisclosed problems in Wilmington House. At the motion to dismiss stage,

---

**18.** Plaintiffs ask this Court to reconsider its ruling that the bank owed no duty of affirmative disclosure to the plaintiffs, citing the financing of the Wilmington House investments as evidence of an ongoing relationship. The Court stands by its holding in the prior opinion. 599 F.Supp. at 1080–81. The fact that Equitable lent money to the plaintiffs in the Wilmington House deal does not raise the relationship between the plaintiffs and the bank to the level necessary to require Equitable to disclose material information. This is especially true for the Wilmington House claims, because, prior to investing in Wilmington House, plaintiffs had absolutely no contact with Equitable.

mere allegations of knowledge and participation were sufficient for this Court to continue forward. Plaintiffs can no longer rely on unsupported allegations of fact. *Tilden Financial Corp. v. Palo Tire Serv., Inc.*, 596 F.2d 604, 607 (3d Cir.1979). The plaintiffs have not come forward with the necessary evidence to support Count 18; therefore, it will be dismissed.

■ The Court reaches the same result for the Count 17 conspiracy claim. In order to prove conspiracy under § 10(b) and Rule 10b–5, a plaintiff must prove the elements required for aiding and abetting liability plus an agreement between Equitable and the other conspirators. *See In Re Falstaff Brewing Antitrust Litigation*, 441 F.Supp. 62 (E.D.Mo.1977). As stated above, there are no facts to indicate aiding and abetting. And, unlike the Eagle claims discussed, *supra,* there are not sufficient facts from which an agreement can be inferred. Accordingly, Count 17 will be dismissed.

### 2. Common Law Negligence

■ In Count 20, plaintiffs allege that Equitable was negligent in supervising its employees, specifically Meszaros, with respect to the Wilmington House claims. As discussed in the securities law section, the bank did not owe the plaintiffs any affirmative duty of disclosure. Plaintiffs have not demonstrated that a bank is under a duty to insure that an investment is sound before loaning money to a customer on that investment.[19] Prior to investing in Wilmington House, plaintiffs had no direct contact with any representative of Equitable; thus, Equitable did not play a significant role in plaintiffs' decision to invest. Even assuming there is a duty, plaintiffs' claim that the breach occurred because Equitable negligently allowed the violation of Counts 16, 17, and 18. However, as discussed above, plaintiffs have failed to prove the allegations in those counts.

Summary judgment will therefore be granted to Equitable for Count 20.

### 3. RICO

■ In Count 23, plaintiffs sued Equitable for a violation of RICO, 18 U.S.C. § 1962(c) under 18 U.S.C. § 1964(c) "for its participation in the sale of limited partnership interests in Wilmington House Associates." Second Amended Complaint, ¶ 179. Because the predicate acts to the RICO claim, embodied in Counts 16, 17, and 18 have not been proven, the Court will also grant summary judgment on the RICO Count.

### 4. Summary of Wilmington House Claims

As the above discussion illustrates, this Court's holding that the investment decision doctrine does not apply to plaintiffs' investment is fatal to the Wilmington House plaintiffs' claim. Summary judgment will be granted in defendant's favor for all the remaining Wilmington House Counts: Counts 16, 17, 18, 20, and 23.

### B. EAGLE

### 1. Securities Claims

■ The § 10(b) and 10b–5 claims asserted against Equitable for its involvement in the Eagle limited partnership arise from the misrepresentations Rous allegedly made at the November 6, 1978 meeting. *Hill II,* 599 F.Supp. at 1082.

Plaintiffs not only state a claim with respect to the affirmative misrepresentations themselves, but also state a claim with respect to Rous' failure to disclose material information which rendered the representations false or misleading, and Equitable's intentional or reckless failure to subsequently disclose newly acquired information which rendered the represen-

---

**19.** A distinction exists between the bank's duties with respect to the Wilmington House and the Eagle investors. That distinction arises because the plaintiffs sought Equitable's advice with respect to the Eagle investment, and the plaintiffs

deposited substantial money at Equitable at the time of the Eagle investment. A discussion of the bank's duty with respect to the Eagle investment is, *infra,* in the Eagle section of the opinion.

tations false or misleading at the time of representation.

*Id.* (footnote and citations omitted).

Defendant moves for summary judgment on the grounds that the statements made by Rous were not misrepresentations, that plaintiffs did not rely on Rous' statements, and that the statements made were not material.[20]

Defendant first argues that because, by plaintiffs' own admission, Eagle was a sound investment, Rous did not make a misrepresentation at all. This argument is based on deposition testimony from both Ruger and Scott. *See* Opening, Exs. I, K. Though it is true that plaintiffs seem unsure about the soundness of the Eagle investment, other facts may lead a jury to conclude that the Eagle investment was not sound. The facts of the resyndication, the settlement of the Ward lawsuit, and the Alma loan to be repaid by Eagle are all factors which enter into a determination of the soundness of the Eagle investment.

Plaintiffs claim that Rous' failure to elaborate on the extent of the Der-Equitable relationship was a misrepresentation. Defendant argues that because plaintiffs knew that Equitable would be lending money to the partnership for equipment had plaintiffs known more facts about the money owed to the bank, this would have only made the plaintiffs more reliant on the bank. The problem with this argument is that it is conceivable that, had the plaintiffs known the full extent of the Equitable-Der relationship, plaintiffs may not have relied on Equitable's view as the opinion of a knowledgeable and relatively independent third party. Once Equitable's interest in the investment became too great, plaintiffs may have felt that Equitable was, along with Der, trying to sell the investment. Defendant infers from the facts that plaintiffs would have relied more on the bank if plaintiffs had known all the facts; however, as set out above, there exists another plausible inference from the facts, thus precluding a finding of summary judgment.[21]

The last question to be addressed for the § 10(b) and 10b–5 violations is Equitable's liability for the actions of Rous. Plaintiffs contend that the bank is primarily liable for the acts of Rous because Rous was an officer of the bank. This view comports with the Third Circuit's view in *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 182 n. 8 (3d Cir.1981), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982):

> Officers are able to make policy and generally carry authority to bind the corporation. Their actions in behalf of the corporation is therefore primary, and holding a corporation liable for their actions does not require respondeat superior.

Plaintiffs have presented enough evidence of Rous' role as an officer in Equitable to allow for the possibility of primary liability.

 In *Hill II,* this Court stated its opinion that the bank would not be vicariously liable for the acts of its employees. 599 F.Supp. at 1082 n. 21. On further development of the facts, however, this Court holds that a bank can be vicariously liable for acts by its employees done on behalf of the corporation that constitute

---

**20.** Defendant also disputes that the statements alleged in the interrogatories and the depositions were made. What Rous actually said at the November 6 meeting is, however, a question of fact to be decided by a jury. The Court notes that plaintiffs' deposition testimony does not claim Rous said as much as do their interrogatories; however, the interrogatories, as well as the depositions, are a factual submission. For the purposes of summary judgment, the Court will give the plaintiffs benefit of the doubt. Even on a narrower view of the misrepresentations made, testified to by Ruger, Rous said that the investment was sound. Opening, Ex. M, pp. 445–446. Once this representation was made, the bank, as held in *Hill II* had an affirmative duty to disclose material facts relevant to the investment.

**21.** Plaintiffs' deposition testimony is somewhat sparse on this point, but Ruger testified that he wanted "assurance form a party, a third party other than Mr. Der" before entering into the investment. Answering, Ex. 11, p. 337. Equitable's status as a party "other than Mr. Der" becomes weaker as Equitable's relationship with Der appears to be closer. The facts of the relationship that Rous failed to disclose when affirming the soundness of the investment thus become material.

securities violations. This view results from comparing the facts of this case to those of *Rochez Brothers v. Rhoades,* 527 F.2d 880 (3d Cir.1975), and those in *Sharp v. Coopers & Lybrand, supra.*

In *Rochez Brothers,* the Third Circuit held that a corporation could not be vicariously liable for the securities violations of its employees. That case involved the fraudulent sale of a corporation's stock by the president of the corporation to the executive vice-president of the corporation. That court stated that:

> If we were to apply *respondeat superior* as appellant wishes, we would in essence impose a duty on a corporation to supervise and oversee the activities of its directors and employees when they are dealing *with their own corporate stock as individuals, and not for the corporation or for the benefit of the corporation.* 527 F.2d at 885 (emphasis added).

By contrast, the instant case involves acts by Rous not for his own interests but for the interests and for the benefit of the corporation.

In *Sharp,* the Third Circuit held that there was a narrow exception to the *Rochez* rule of no vicarious liability. The court held that an accounting firm was vicariously liable for 10b–5 violations by its employees because the accounting firm knew that the investing public would place a high level of confidence in the opinion letters issued by the accounting firm. Although the Court does not believe that the bank's duty goes so far as to require it to disclose relevant facts to prospective lenders, a bank is under a duty not to misrepresent to prospective investors facts when those investors request information from the bank. A commercial bank stands in a position of trust to the investing public and should be under a duty to ensure that its officers are not misrepresenting facts to the investing public.[22] In *Sharp,* the accounting firm received a benefit in its compensation for issuing the opinion letters; in the instant case, the bank's benefit is two-fold—it potentially received income from loans and it found investors to bail out Alma. In such a situation, the bank should be sure that its employes are not misrepresenting facts to potential customers.

Plaintiffs next contend that Equitable is liable for aiding and abetting Der's § 10(b) violations and for conspiring to violate § 10(b).[23] Plaintiffs have offered sufficient facts to survive a summary judgment motion. Defendant's actions in the resyndication of Alma into Eagle, the settlement of the Ward lawsuit, and the misrepresentations made by Rous, all are facts which could lead a jury to conclude that the defendant knowingly and substantially participated in Der's securities violations.[24]

The only additional ingredient necessary for a conspiracy claim is evidence of an agreement. Defendant makes much of the fact that plaintiffs cannot point to any evidence of an explicit agreement; however, it would be permissible for a jury to infer that there was an agreement from the acts taken by the parties.[25]

Plaintiffs' final federal securities claim is based on the "controlling person" provision of the securities laws:

> Every person who, by or through stock ownership, agency, or otherwise, or who

---

**22.** A distinction exists between an affirmative duty to disclose, which the Court has not found in this case, and a duty to supervise against misrepresentations by employees. Simply because a bank's duty in a case like this is not equivalent to a duty of a fiduciary does not mean that the bank has no duty at all. *See, supra,* n. 18 and *Hill II,* 599 F.Supp. at 1080–1081 (holding a bank in Equitable's position, unlike a fiduciary, does not have an affirmative duty to disclose).

**23.** The legal standards for these violations are set out in the Wilmington House section of this Opinion.

**24.** Because of this Court's holding on the investment decision doctrine question, acts taken after the purchase of the Eagle interests are not relevant to either the underlying § 10(b) violations or to any aiding and abetting claims.

**25.** Defendant argued quite compellingly at oral argument that if Equitable was a participant in this fraud, it made no sense for it to deny loans to some of the plaintiffs because that denial seriously jeopardized the Eagle deal. That argument, however, raises a factual question for a jury to decide.

pursuant to or in connection with an agreement or understanding with one or more other person by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist. 20(a) of the Securities Act of 1934; 15 U.S.C. § 77*o*.

In determining whether a party controls another, "courts have given heavy consideration to the power or potential power to influence and control the activities of a person." *Rochez Bros.*, 527 F.2d at 890. In *Hill II*, the Court doubted the merits of plaintiffs' § 20(a) claim but permitted it to go forward to learn the circumstances surrounding the resyndication. 599 F.Supp. at 1084.

In response to defendant's summary judgment, plaintiffs only factual support for controlling person liability is the fact that Alma and Der owed the bank money. Though no Third Circuit case discusses whether or not a creditor-debtor relationship creates controlling person status, the Eighth Circuit has refused to find that the primary lender of a corporation was a controlling person of that corporation. *Metge v. Baehler*, 762 F.2d 621, 632 (8th Cir.1985). Similarly, in *Wright v. Schock*, 571 F.Supp. 642, 644 (N.D.Cal.1983) *aff'd.*, 742 F.2d 541 (9th Cir.1984), the court declined to find that a bank was a controlling person when the claim was based upon the fact that the bank's loans and other services were indispensible to the operation of the allegedly controlled corporation. Plaintiffs have not provided any evidence beyond indebtedness to create controlled person status. Such a showing is insufficient to support a claim for control person liability; therefore, summary judgment will be granted for Count 14.

### 2. Common Law

 Plaintiffs raise four state common law claims against Equitable for the Eagle investment: deceit and fraud; conspiracy to deceive and defraud; negligent misrepresentation; and negligence. Defendants claim that the deceit and fraud claim should be dismissed, because the statement that the investment was sound is a statement of opinion and not of fact.[26] Under Maryland law, a claim for fraud requires that the statement that is the basis of fraud be a statement of fact. *Buschman v. Codd*, 52 Md. 202, 207 (1879). Defendant contends that Rous' statement that Eagle was a sound investment is a statement of an opinion and cannot substantiate a fraud claim. Defendant's argument is incorrect. When Rous was asked to comment on the investment, the question was predicated on the fact that the plaintiffs had all the information material to the investment before them. A jury may conclude that Rous defrauded plaintiffs by stating the investment was sound without disclosing the facts of the Alma resyndication when Rous knew that plaintiffs had no knowledge of the resyndication. Similarly, a jury could infer an agreement, or conspiracy, to defraud based on the acts taken prior to the November 6th meeting and the acts taken at the November 6th meeting. Summary judgment will therefore be denied for Counts 3 and 9.[27]

The remaining two common law counts are negligent misrepresentation and negli-

---

**26.** Again, as in the federal securities claims, any duties that Equitable had arose out of the November 6th representations.

**27.** Defendant contends that plaintiffs have failed to raise any genuine dispute as to a material fact with respect to the common law claims. Reply at 46. Therefore, defendant argues, this Court could grant summary judgment for the

claims. The problem with this argument is the facts, as stated, do not compel a finding for defendant as a matter of law. As in the equitable tolling section, *supra*, a jury could permissibly reach two different conclusions based upon the existing facts. In such a situation, summary judgment is inappropriate.

gence.[28] The principle elements of the tort of negligent misrepresentations in Maryland are the following:

(1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement;

(2) the defendant intends that his statement will be acted upon by the plaintiff;

(3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury;

(4) the plaintiff, justifiably, takes action in reliance on the statement; and

(5) the plaintiff suffers damage proximately caused by the defendant's negligence. *Martens Chevrolet v. Seney,* 439 A.2d 534, 292 Md. 328 (1982); *Virginia Dare Stores v. Schuman,* 1 A.2d 897, 175 Md. 287 (1938).[29]

Most of the issues presented by the above elements are identical to those presented by the securities claims and the common law fraud claim. As in those causes of action, questions of fact remains.

██ The new question that arises for the negligent misrepresentation count—and for the negligence count as well—is the question of duty; that is, what duty of care does Equitable owe the plaintiffs in the circumstances of this case? In *Jacques v. First National Bank,* 307 Md. 527, 515 A.2d 756 (1986), the Maryland Court of Appeals ruled that a lending bank had a duty of reasonable care in processing the loan applications of a potential borrower. Although the nature of the duty in *Jacques* is different from the duty plaintiffs assert in the instant case, the rationale for finding that the bank had a duty in *Jacques* leads this Court to conclude that a duty exists here as well.

In finding a duty in *Jacques,* the Maryland court emphasized the existence of a contractual relationship between the parties. 515 A.2d at 760. When a tort cause of action involves economic loss, the court held that something approaching contractual privity would be necessary to create a tort duty. The legal relationship in *Jacques* was based upon the contract between Jacques and the bank: the bank promised to lock in a particular interest rate and process the loan application; in exchange, Jacques paid a loan application fee.[30] In the instant case, the plaintiffs sought advice and financing from the defendant. According to Ruger's testimony, he and Scott deposited substantial money at Equitable in order to establish a banking relationship. Answering, Ex. 35, pp. 479–486. They decided to establish this relationship based on Rous' comments to them. *Id.* Thus, as in *Jacques,* plaintiffs gave the bank consideration in exchange for the bank's promise to fairly process a loan application.

██ Under the reasoning of *Jacques,* some duty exists between Equitable and plaintiffs. The duty plaintiffs seek here is greater than the duty imposed in *Jacques;* this Court must determine if the duty imposed on Equitable should cover negligent misrepresentation. First, though the tort duty arises from the contractual relationship, the duty is not limited by the bounds of that contract; otherwise, the tort duty and the contractual obligation would be identical. Second, the *Jacques* court's discussion of the nature of the banking business and the duties resulting indicates that Maryland courts would find a duty against negligent misrepresentation in the banking context:

The banking business is affected with the public interest. Traditionally banks and their officers have been held to a high degree of integrity and responsiveness to their public calling. Although not directly applicable to the respondent because of its status as a national bank, the requirements imposed by the Maryland legislature illustrate this State's pol-

---

**28.** Counts 12 and 13.

**29.** A plaintiff can plead separate counts of negligent misrepresentation and deceit based on the same nucleus of facts. *Martens Chevrolet,* 439 A.2d at 539.

**30.** More than the mere filing of a loan application was necessary to create the necessary contractual relationship. Once the bank agreed to process the application, a duty came into existence. 515 A.2d at 762.

icy concerning the bank industry ... The recognition of a tort duty of reasonable care under the circumstances presented by this case is thus consistent with the policy of this State as expressed by the Legislature, and reasonable in light of the nature of the banking industry and its relation to public welfare. 515 A.2d at 764.

This policy rationale is equally appropriate to finding a duty against negligent misrepresentation under the facts of this case. Plaintiffs solicited Rous' view of the Eagle investment, as well as financing from the bank. Rous suggested that plaintiffs deposit money at the bank while representing that plaintiffs would receive loans and that the investment was sound. Whether or not he should have told plaintiffs more about the bank's relationship to Eagle is a jury question. Based on the meeting and the resulting deposits, a contractual relationship came to exist which required the bank to exercise due care in communicating facts to plaintiffs.[31] Because this Court finds that the bank had a duty to these plaintiffs and all the other requirements present factual questions, summary judgment will be denied for the negligent misrepresentation count.

■ For similar reasons, the Court will deny the summary judgment motion with respect to the negligence count. The extent to which the bank should have been supervising employees like Rous and Meszaros is a question of fact. Similarly, whether negligent supervision caused the plaintiffs' injury is a question to be decided by a jury. As in the negligent misrepresentation count, the Court finds a duty based upon the *Jacques* case.

### 3. RICO

■ In order to state a claim under 18 U.S.C. § 1962(c), a plaintiff must demonstrate that a person employed by or associated with an enterprise conducted the affairs of that enterprise through a pattern of racketeering activity. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 788 (3d Cir.1984), cert. denied, 469 U.S. 1211, 105 S.Ct. 1179, 84 L.Ed.2d 327 (1985).[32] In *Hill III*, the Court denied a Fed.R.Civ.P. 12(b)(6) motion to dismiss these RICO counts; now, defendant contends that plaintiffs' RICO counts should be dismissed for failure to present facts of an "enterprise" or of a "pattern of racketeering activity."[33] Defendant also contends that plaintiffs have failed to present the necessary evidence to support a claim of conspiracy to commit a RICO violation pursuant to 18 U.S.C. § 1962(d).

Plaintiffs pled two potential enterprises in this case; either the Eagle partnership or Equitable in combination with the other Eagle defendants,[34] is the enterprise through which the plaintiffs claim the racketeering activity took place. Plaintiffs have provided sufficient evidence for their claim that Eagle was the enterprise through which the pattern of racketeering activity occurred but have not provided sufficient evidence for their claim that the enterprise was Equitable, Eagle, and the other Eagle defendants.

The definition of enterprise under RICO is "any individual, partnership, corporation, or other legal entity, and any union or group of individuals associated in fact al-

---

**31.** The issuance of letters of credit alone is not enough to create this duty. Only when the loans are issued or it is represented that they will be issued in conjunction with representations about an investment's quality in exchange for deposits does a duty arise.

**32.** Technically, 18 U.S.C. § 1962(c) represents a criminal violation. A civil plaintiff can recover treble damages based on a violation of § 1962(c), however. 18 U.S.C. § 1964(c).

**33.** The RICO counts relevant to Eagle are Counts 21 and 22 of the Second Amended Com-

plaint. Count 21 is a claim for violation of RICO, and Count 22 is a claim for conspiracy to commit a RICO violation.

**34.** Equitable contends that the second potential enterprise makes no sense because there are no other defendants in this case. The interrogatory answers' reference to the "Eagle defendants" refers not to other defendants in this action but to the defendants named in *Hill v. Der* and listed in ¶ 15 of the Second Amended Complaint: Lee P. Der, Lee P. Der, Inc., D & S Financial, Inc., Eagle, Alma, Der-Mas, Inc., and Roger Ball.

though not a legal entity." 18 U.S.C. § 1961(4). Eagle is a limited partnership that easily fits into the first half of this definition. In order to prove that Equitable, Eagle, and some or all of the *Hill v. Der* defendants constitute an enterprise, however, plaintiffs must satisfy the three part test established in *United States v. Riccobene,* 709 F.2d 214 (3d Cir.1983), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983).

In *Riccobene,* this court stated that in order to establish the existence of an enterprise, the government must demonstrate (1) that the enterprise is an ongoing organization with some sort of framework or superstructure for making or carrying out decisions; (2) that the members of the enterprise function as a continuing unit with established duties; and finally (3) that the enterprise must be separate and apart from the pattern of racketeering activity in which it engages. 709 F.2d at 221–224. *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.,* 742 F.2d 786, 789 (3d Cir.1984).[35]

Plaintiffs have not offered any evidence to satisfy the first prong of the *Riccobene* test. There is nothing to indicate that Equitable formed an ongoing organization with "some sort of framework or superstructure" with the *Hill v. Der* defendants.

Plaintiffs will have to rely on Eagle alone as the enterprise for purposes of their RICO claim. Plaintiffs' factual submissions concerning the August 18 and November 6 meetings are sufficient to establish that Equitable was at least peripherally involved in the affairs of the Eagle enterprise. "Numerous courts have held that indirect or peripheral involvement in the affairs of the enterprise such as that alleged of Equitable, is sufficient to establish a claim under RICO. *See, e.g., Bank of America v. Touche Ross & Co.,* 782 F.2d 966, 970 (11th Cir.1986); *United States v. Forsythe,* 560 F.2d 1127, 1136 (3d Cir. 1977)." *Hill III,* 642 F.Supp. at 1018.

Equitable's contention that a pattern of racketeering activity cannot exist when only one scheme is involved relies on district court precedent that this Court has declined to follow in the past. Defendant relies on *Fleet Management Systems, Inc. v. Archer-Daniels-Midland Co.,* 627 F.Supp. 550 (C.D.Ill.1986), for the proposition that more than one scheme is necessary. In *Hill III* and *Mullin v. Bassett,* 632 F.Supp. 532 (D.Del.1986), this Court held that it would follow a contrary string of precedent which holds that a pattern may be proven even when only one fraudulent scheme exists. *See, e.g., Bank of America v. Touche Ross & Co.; Trak Microcomputer Corp. v. Wearne Bros.,* 628 F.Supp. 1089 (N.D.Ill.1985).

Provided the predicate acts for the pattern are sufficiently different and ongoing, a RICO violation can exist even if there is only one fraudulent scheme. Plaintiffs have provided sufficient factual support for the allegations presented to satisfy the pattern requirement to survive a summary judgment motion.

In order to find a defendant liable for a RICO conspiracy, something other than the agreement to commit predicate actions must be shown. *Hill III,* 642 F.Supp. at 1020. The defendant need not, however, have agreed to commit personally two or more predicate acts. *Id.* In the Third Circuit, "to be convicted of a RICO conspiracy, a defendant must agree only to the commission of the predicate acts and need not agree to commit personally those acts." *United States v. Adams,* 759 F.2d 1099, 1116 (3d Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). In reaching this result, the Third Circuit adopted the reasoning of *United States v. Carter,* 721 F.2d 1514, 1531 (11th Cir.), *cert. denied,* 469 U.S. 819, 105 S.Ct. 89, 83 L.Ed.2d 36 (1984): "When ... a defendant agree[s] to participate in the conduct of an enterprise's affairs with the objective of violating a substantive RICO provision, it is not necessary that the defendant agree to

**35.** *Seville* applied the *Riccobene* test to a civil RICO claim. *Riccobene's* test is based upon the Supreme Court's holding in *United States v.*

*Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

personally commit two predicate acts for the required pattern of racketeering activity." Direct evidence of an agreement is unnecessary; instead, proof may rest upon inferences drawn from relevant and competent circumstantial evidence. *United States v. Carter,* 721 F.2d at 1532; *United States v. Elliott,* 571 F.2d 880, 903 (5th Cir.), *cert. denied,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978). The facts of the August 18 meeting and the Der-Equitable relationship leading up to and including the November 6 meeting provide sufficient evidence for a possible jury finding that an agreement existed.

CONCLUSION

For the reasons stated in the foregoing opinion, summary judgment will be granted in favor of defendant for the Wilmington House claims and will be denied for most of the Eagle claims. The Eagle claims based on 15 U.S.C. §§ 77*l*, 77*o*, and 78t, however, are dismissed. An Order will enter in conformity with this Opinion.

AMENDMENT TO OPINION OF
JANUARY 9, 1987

CALEB M. WRIGHT, Senior District Judge.

Defendant Equitable Bank filed a motion to alter or amend the judgment this Court issued on January 9, 1987.[1] Defendant's primary contention is that the § 10(b) and Rule 10b–5 claims of the non-Delaware plaintiffs, Thomas Ruger, Virgil and Marie Scott, and Data Controls North, Inc. should be dismissed on statute of limitations grounds.

■ In the January 9, 1987 Opinion, the Court held that the investment decision doctrine did not apply; accordingly, the non-Delaware plaintiffs purchased their Eagle shares in November of 1978. Op. at 9–16. Defendant contends that this hold-

ing should have resulted in the dismissal of the non-Delaware plaintiffs' securities claims because the Maryland Blue sky statute of limitations, the applicable statute of limitations, has an outside bar of three years. MD.CORPS. & ASS'N.CODE ANN. § 11–703(f). This outside time limitation means that an action for securities fraud must be brought within three years of the purchase or sale, regardless of any tolling considerations.[2] In *Hill I,* this Court held that the non-Delaware plaintiffs' securities claims were governed by Maryland law. "[A] 10b–5 action in Maryland may not be brought later than one year after a reasonable date of discovery or three years after the contract of sale, whichever comes first. *See O'Hara v. Kovens,* 625 F.2d [15], 17 [ (4th Cir.1980), *cert. denied,* 449 U.S. 1124, 101 S.Ct. 939, 67 L.Ed.2d 109 (1981) ]." 562 F.Supp. at 1336. *See also Morley v. Cohen,* 610 F.Supp. 798 (D.Md.1985).

In the Opinion issued on January 9, 1987, the Court neglected to apply the three year outside bar and only applied the "one year from discovery" provision of the Maryland statute. Because the Court held that factual questions remained with respect to the plaintiffs' equitable tolling arguments, the Court held that the securities claims could not be dismissed on statute of limitations grounds. If an absolute three year bar applied, however, the non-Delaware plaintiffs' claims would be barred because the suit was filed more than three years after the purchase. The Court now holds that defendant has correctly read *Hill I, Morley* and the Maryland statute; therefore, the three year outside bar should have been applied, and the securities claims of the non-Delaware plaintiffs in Eagle will be dismissed.

Indeed, in briefing on an earlier motion before this Court, plaintiffs recognized that this Court had held the outside bar to apply

---

1. This amendment is to be attached to the January 9, 1987 Opinion. Citations to that opinion will be to "Op.".

2. Federal securities claims brought under § 10(b) and Rule 10b–5 are governed by "borrowed" state statutes of limitations. The Court has ruled that the Delaware statute of limita-

tions should apply for the Delaware plaintiffs. *Hill I,* 562 F.Supp. at 1337. The only Delaware resident in the Eagle portion of this litigation is James Stritzinger. There is no outside bar to the Delaware statute of limitations that the Court has ruled should apply to this case.

to the instant case: "It is also the law of this case that the statute of limitations governing the non-Delaware plaintiffs' 10b–5 claims is contained in Maryland's Blue Sky Law, MD.CORPS & ASS'NS. CODE ANN. § 11–703(f), and that under it such claims may not be brought later than one year after a reasonable date of discovery of the facts or three years after the contract of sale, whichever occurs first." Plaintiffs' Memorandum in Opposition to Motion of Defendant Equitable Bank, National Association to Dismiss Amended Complaint, January 23, 1984, pp. 12, 13. The Court will not now reconsider a decision it made for this case in 1983 that all the parties understood to be the law of this case. Unfortunately, in the January 9, 1987 Opinion, the Court failed to apply the three year outside bar that applied to the non-Delaware plaintiffs. Footnote 17 of the Opinion is thus incorrect and should be disregarded. Op. at 26. Counts 1, 2, 4, 5, 6, 7, 8 and 10 will therefore be dismissed as to the non-Delaware plaintiffs.

The Court's decision that the purchase of Eagle securities occurred in the fall of 1978 has also led defendant to seek dismissal of Count 5 with respect to all plaintiffs. Count 5, one of the several § 10(b) and Rule 10b–5 counts alleged in the second amended complaint, is primarily based upon events that transpired in 1979. Defendant, therefore, contends that the misrepresentations alleged did not occur in connection with the purchase or sale of a security. As this Court noted in dismissing the Wilmington House securities claims, summary judgment should be granted to defendant when the plaintiffs cannot demonstrate a causal connection between the misrepresentation and the purchase or sale. Op. at 27. Defendant argues that the same reasoning should result in the dismissal of Count 5.

Plaintiffs' two arguments in response are to no avail. First, plaintiffs contend that because they have incorporated all prior factual allegations of the complaint into Count 5, there are facts involved in Count 5 that occurred prior to or contemporaneous with the purchase.[3] The problem with this argument is that all those other factual allegations are included in other securities allegations. What distinguishes Count 5 from the other securities counts are the allegations concerning 1979. Those allegations are irrelevant to a claim of a § 10(b) or 10b–5 securities violation.[4] If the only relevant factual allegations in Count 5 are those that are already found in the other securities counts, there is no need for Count 5. Plaintiffs also argue that they now have evidence to indicate that Equitable knew that Der was being investigated prior to the purchase. Count 5 of the complaint does not allege this, nor have plaintiffs ever attempted to amend this Count to include such an allegation. Count 5 of the complaint will therefore be dismissed.

Defendant's in their motion to amend contend that the RICO counts as to the non-Delaware plaintiffs should be dismissed once the predicate acts of securities fraud have been dismissed. Defendant claims that this follows under the same reasoning the Court applied in dismissing the RICO counts with respect to Wilmington House; however, the Wilmington House securities claims were dismissed on their merits while the Eagle securities claims will be dismissed on statute of limitations grounds. This Court's dismissal in Wilmington House represented a holding that no securities violation ever occurred. By contrast, the dismissal of the Eagle claims is not based on a holding that the violation did not occur; rather, recovery based upon that violation is simply time barred.

---

**3.** The important factual allegation in Count 5 is that Equitable knowingly omitted to notify the plaintiffs that the SEC issued an Order on July 16, 1979 finding that Der and Lee P. Der, Inc. had willfully violated several of the securities laws in connection with the sale of limited partnership interests and that the Order suspended the broker/dealer registration of D & S Financial, Inc., suspended Der from association with any broker or dealer and censured Lee P. Der, Inc.

**4.** They may be relevant with respect to the equitable tolling arguments advanced by plaintiffs.

This Court will follow the *Morley* court in holding that a RICO claim can survive even if recovery for the predicate acts that comprise part of the RICO claim cannot survive. In *Morley,* the Maryland District Court ruled that the applicable state statute of limitations for a civil RICO claim in Maryland is MD.CTS. & JUD. PROC.CODE ANN. § 5–101. 610 F.Supp. at 809. The general fraud provision does not contain an outside bar like the Blue Sky statute of limitations. Thus, the *Morley* court implicitly applied the federal equitable tolling doctrine in not dismissing the RICO claims as time barred. *Id.* The RICO claim survived in *Morley* despite the fact that the plaintiff could not recover for the predicate acts of securities fraud.

In reaching this decision, the Maryland district court applied the reasoning the Third Circuit Court of Appeals has used in criminal RICO actions. *See United States v. Forsythe*, 560 F.2d 1127, 1135 (3d Cir. 1977); *United States v. Davis,* 576 F.2d 1065, 1067 (3d Cir.1978), *cert. denied,* 439 U.S. 836, 99 S.Ct. 119, 58 L.Ed.2d 132 (1978). In both these cases, the Third Circuit held that the fact that the statute of limitations had run on the predicate acts did not mean that those predicate acts could not be considered for purposes of proving a RICO violation. The violation of RICO is a separate violation from the individual predicate acts. "In short, RICO does not provide a remedy for the mere commission of the predicate acts. Rather, RICO prohibits the use of the predicate acts to invest in, acquire or maintain an interest in, or conduct the affairs of, an enterprise whose activities affect interstate commerce. 18 U.S.C. § 1962." *Morley,* 610 F.Supp. at 808. Applying the statute of limitations from the predicate acts to RICO would be unrealistic in that the different predicate acts have different statutes of limitations; therefore, it is more appropriate to determine a statute of limitations for RICO as an offense distinct from the various predicate acts. It is true in the instant case as well that the RICO violations alleged are distinct from the particular securities violations. The fact that the predicate securities claims are time barred does not mean that the RICO claims should be dismissed. Defendant's motion to dismiss these claims will be denied. As in *Morley,* the general fraud provision of Maryland will be applied to the civil RICO claim.[5] The factual issues of equitable tolling applicable to the securities claims apply to the RICO claims as well. Because the non-Delaware plaintiffs' RICO claims have not been dismissed, the Court retains jurisdiction over their state law claims.

An Order will enter in conformity with this Opinion.

---

**5.** Following the *Morley* court's determination of the proper state statute of limitations to apply is in accordance with the Third Circuit Court of Appeals holding "that in borrowing state limitations periods for civil RICO claims courts must select, in each state, the *one* most appropriate statute of limitations for *all* civil RICO claims." *Malley-Duff & Associates v. Crown Life Ins. Co.,* 792 F.2d 341, 349 (3d Cir.) (holding the Pennsylvania "catch-all" limitations period to be the appropriate period for civil RICO) (emphasis in original), *cert. granted in part,* —— U.S. ——, 107 S.Ct. 569, 93 L.Ed.2d 573 (1986). The Court believes that following the *Morley* court's approach will promote the goal of uniformity the Third Circuit discussed in *Malley-Duff.*