

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-27-2007

# In Re: Exxon Mobil

Precedential or Non-Precedential: Precedential

Docket No. 05-4571

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"In Re: Exxon Mobil " (2007). *2007 Decisions.* Paper 487.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/487

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-4571

IN RE: EXXON MOBIL CORP. SECURITIES
LITIGATION

Ohio Public Employees Retirement Fund,
State Teachers Retirement Fund of Ohio
and Antonio N. Martins,*

Appellants

*Pursuant to Rule 12(a), F.R.A.P.

Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action Nos. 04-cv-01257 & 04-cv-01921)
District Judge: Honorable Freda L. Wolfson

Argued January 8, 2007

Before: McKEE, AMBRO, and FISHER, Circuit Judges.

(filed: August 27, 2007 )

Daniel B. Allanoff, Esquire
Meredith, Cohen, Greenfogel & Skirnick
117 South 17th Street, 22nd Floor
Philadelphia, PA  19103

Erin K. Flory, Esquire
Steve W. Berman, Esquire
Hagen, Berman, Sobol & Shapiro
1301 5th Avenue, Suite 2900
Seattle, WA   98101

John C. Murdock, Esquire (Argued)
Murdock, Goldenberg, Schneider & Groh
35 East 7th Street, Suite 600
Cincinnati, OH   45202

        Counsel for Appellants

James W. Quinn, Esquire
Joseph S. Allerhand, Esquire
John A. Neuwirth, Esquire
Weil, Gotshal & Manges
767 Fifth Avenue, 27th Floor
New York, NY 10153

Paul F. Carvelli, Esquire
McCusker, Anselmi, Rosen, Carvelli & Walsh
127 Main Street
Chatham, NJ   07928

Gregory S. Coleman, Esquire (Argued)
Marc S. Tabolsky, Esquire
Weil, Gotshal & Manges
8911 Capital of Texas Highway
Suite 1350, Building One
Austin, TX  78759

    Counsel for Appellees

---

## OPINION OF THE COURT

---

AMBRO, Circuit Judge

By most accounts, the merger between Exxon and Mobil has been quite successful.  Shareholders in the new ExxonMobil have benefitted from a tremendous increase in stock price since the companies' merger in 1999.  But the plaintiffs here, former shareholders of Mobil, want more.  They allege that a misrepresentation by Exxon made in the course of the merger negotiations and ensuing votes caused them to receive fewer shares in the combined corporation than they otherwise were entitled.  We will never know the merits of this allegation though, for we agree with the District Court that this lawsuit is not timely under the relevant statutes.

3

# I. Allegations in the Complaint[1]

Quite unlike the prevailing price of oil as we consider this case, world oil prices in the late 1990s, as measured in constant dollars, were near historic lows. At least partly in response to that market condition, Exxon Corporation and Mobil Corporation—already giants in the oil industry—announced plans on December 1, 1998, to merge into the world's largest oil company, ExxonMobil Corporation. The merger was to take the form of a stock-for-stock exchange whereby, in relevant detail, each share of Mobil stock would be exchanged for 1.32015 shares of ExxonMobil, thus giving former Mobil shareholders about 30% ownership in the new company. Shareholders of both companies voted on and approved the stock-for-stock merger on May 27, 1999, and the Federal Trade Commission blessed it some six months later. The merger took effect (*i.e.*, shares in the old companies were exchanged for new shares in ExxonMobil) on November 30, 1999.

---

[1]"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. ___, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. ___, 127 S. Ct. 1955, 1965 (2007)). On an appeal from the grant of a motion to dismiss, we apply the same standard as does a district court. *Yarris v. County of Del.*, 465 F.3d 129, 134 (3d Cir. 2006).

Prior to the companies' respective shareholder votes, on March 26, 1999, Exxon filed its required Securities and Exchange Commission (SEC) Form 10-K for the year ending the previous December 31. That filing, in turn, was incorporated by reference in the proxy statement issued by both Exxon and Mobil in anticipation of the merger votes. Plaintiffs assert that Exxon's Form 10-K—and, therefore, the proxy statement—was false or misleading. And though their eight-part, three-count, 261-paragraph complaint (canvassing, *inter alia*, the history of Exxon Corporation, the science and technology of oil drilling, and the "objectives, concepts, and principles" of modern accounting methods) is prolix, the basic theory of plaintiffs' case can be simply stated.[2]

Because oil prices in the late 1990s were so low, certain oil reserves owned by Exxon had become uneconomical to tap. That is, the cost of extracting a barrel of oil from some of its deposits exceeded the revenue that could be generated from the sale of that barrel. According to Generally Accepted

---

[2]Allegations of fraud must be pleaded "with particularity," FED. R. CIV. P. 9(b), and pleading requirements are heightened even further in securities fraud cases by the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Still, it should not be forgotten that the "plain statement" rule still applies in these cases, as it does in every civil case. *See* FED R. CIV. P. 8(a) (requiring "a *short* and *plain* statement of the claim showing that the pleader is entitled to relief" (emphases added)).

Accounting Principles ("GAAP") promulgated by the Financial Accounting Standards Board ("FASB"), uneconomical assets, like some of Exxon's oil reserves, require specific accounting treatment. In March 1995, FASB issued Statement of Financial Accounting Standard No. 121 ("SFAS 121"), which generally requires that if ever a long-term asset's expected future cash flow is less than its book value, the asset should be classified as "impaired" and its fair value be recognized as a revenue loss for the accounting period in which the asset becomes impaired. Once a company characterizes an asset as impaired, it is irreversible. That is, even if an asset were to become unimpaired, the previously recognized accounting loss cannot be reversed—either in that accounting period or *nunc pro tunc*—until the asset is actually sold.

Exxon did not follow the impairment procedure mandated by SFAS 121. Instead, as candidly stated in its Form 10-K, Exxon's policy was to undertake "disciplined, regular review" of its assets. This "aggressive asset management program," in its estimation, would provide "a very efficient capital base." Consistent with these statements, Exxon did not recognize any of its oil reserves as impaired and, therefore, did not report the accounting losses that such a recognition would have required. In contrast, every other major oil company recognized impaired assets and their resulting effect on net income during the same time-frame. The size of these write-downs on revenue at other oil companies in 1998 ranged from $78 million to $3.52 billion.

6

Using these figures as reference points, plaintiffs estimate that Exxon should have recognized 1998 impairments losses of between $3.37 billion and $5.37 billion. This, of course, would have reduced Exxon's net income by the same amount and, consequently, affected its share price. The resulting lower share price, in turn, would have led Mobil to demand a higher exchange rate (*i.e.*, more shares of ExxonMobil) in its merger with Exxon. The evidence of this, plaintiffs say, is that one of the means by which the two companies decided that each share of Mobil stock would be exchanged for 1.32015 shares of Exxon stock was by consulting a "price/earnings analysis" performed by the investment banking firm Goldman Sachs. Earnings in Exxon's case would have been lower had it recognized the asset impairments. Given the size of the impairments that plaintiffs allege Exxon should have taken, Mobil shareholders would have received an additional 2.3–9% stake in ExxonMobil. This corresponds with damages to those shareholders estimated in the complaint to total between $4.6 billion and $18 billion.

None of these allegations, however, suggests that Exxon fraudulently issued its 1998 Form 10-K, which plaintiffs are required to do to make out a valid securities fraud claim. For this, plaintiffs allege other facts. First, they suggest that the timing of Exxon's decision not to recognize its impaired oil reserves is suspicious—in the midst of merger negotiations and votes (both of which would likely turn out more favorable to Exxon the higher its earnings appeared). Second, plaintiffs cite

7

the claims of a confidential witness who held various financial analyst positions in Exxon's accounting department and first came forward in 2003. In 1995, when SFAS 121 was first issued, the witness had calculated that its effect on Exxon's financial reports would be to require at least a $700 million write-down in earnings. When the witness reported these calculations to supervisors, they purportedly responded that Exxon's Chairman and CEO Lee R. Raymond instead had decreed that SFAS 121 would have "no impact" on Exxon's financial reports. The witness, claiming that Exxon has a "military-like culture," interpreted Raymond's statement to be tantamount to "marching orders for [the] Executive Staff, *i.e.*, they now had to justify . . . 'no impact.'" Later, the witness was also told not to conduct any further impairment analyses.

Third, even if Exxon were allowed to ignore SFAS 121 and follow its own "disciplined, regular review" of its assets as part of an "aggressive asset management program," plaintiffs allege that Exxon's claim that it did not need to recognize *any* of its assets as impaired under its own program did not comport with its contemporaneous public statements. If Exxon had performed a *bona fide* analysis of any sort and determined that its oil reserves were not impaired, then it would necessarily have to expect that oil prices would rebound from their 1998 levels. As Exxon told the SEC in an investigation relating to this very issue, "the corporation does not view *temporarily* low oil prices as a trigger event for conducting the impairment tests." Plaintiffs, however, cite numerous public statements from

8

Exxon officials (including congressional testimony by Raymond) that they allege indicate that Exxon in fact did not view 1998 oil prices to be temporarily low—or, at the very least, that Exxon was unsure whether prices would rebound. *See, e.g.*, Compl. ¶ 199 (quoting Raymond's congressional testimony: "The only thing I can tell you about the price for the next two years is we don't have a clue . . . .").

Plaintiffs filed a three-count complaint in the U.S. District Court for the District of New Jersey against Exxon and Raymond for alleged violations of (1) § 14(a) of the Securities Exchange Act, 15 U.S.C. § 78n(a), and SEC Rule 14a-9 promulgated thereunder (filing a false or misleading proxy statement);[3] (2) § 10(b) of the Securities Exchange Act, 15

---

[3]Section 14(a) of the Act provides that "[i]t shall be unlawful for any person, . . . in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . , to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any [registered] security . . . ." 15 U.S.C. § 78n(a). In turn, SEC Rule 14a-9 provides in relevant part that

> [n]o solicitation subject to this regulation shall be made by means of any proxy statement . . . which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or

U.S.C. § 78j(b), and SEC Rule 10b-5 promulgated thereunder (securities fraud);[4] and (3) § 20(a) of the Securities Exchange

---

necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a-9(a). We refer to claims brought pursuant to 15 U.S.C. § 78n(a) and Rule 14a-9 as "§ 14(a) claims."

[4]Section 10(b) of the Act provides that "[i]t shall be unlawful for any person . . . (b) [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe . . . ." 15 U.S.C. § 78j. In turn, SEC Rule 10b-5 provides that

[i]t shall be unlawful for any person, directly or indirectly . . .

(a) [t]o employ any device, scheme, or artifice to defraud,

(b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon

10

Act, 15 U.S.C. § 78t(a) (derivative liability for Raymond).[5]  The District Court granted Exxon's motion to dismiss because it ruled that both the § 14(a) and § 10(b) claims were barred by the statute of limitations and, in any event, the § 10(b) claim was not properly pleaded.  Plaintiffs appeal each of these rulings, but we need only address the timeliness issues.

## II.  Discussion

The Securities Exchange Act did not explicitly provide a private right of action for claims under either § 10(b) or

---

any person, in connection with the purchase or sale of any security.
17 C.F.R. § 240.10b-5.  We refer to claims brought pursuant to 15 U.S.C. § 78j(b) and Rule 10b-5 as "§ 10(b) claims."

[5]Section 20(a) of the Act provides that
[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.
15 U.S.C. § 78t(a).

11

§ 14(a). As early as 1946, though, courts had begun to recognize implied private rights of action based on § 10(b), *see, e.g.*, *Kardon v. Nat'l Gypsum Co.*, 69 F. Supp. 512 (E.D. Pa. 1946), and the Supreme Court, at least implicitly, approved, *see, e.g.*, *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975); *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 150–54 (1972); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13 n.9 (1971). The same is true for § 14(a). *J.I. Case Co. v. Borak*, 377 U.S. 426, 430–31 (1964).

Having created these causes of action, courts then began to consider the time-frame within which they must be brought. For decades the general practice was to "borrow" the statute of limitations from the closest analogous state-law cause of action. *See, e.g.*, *Bath v. Bushkin, Gaims, Gaines & Jonas*, 913 F.2d 817, 818 (10th Cir. 1990); *Nesbit v. McNeil*, 896 F.2d 380, 384 (9th Cir. 1990); *O'Hara v. Kovens*, 625 F.2d 15, 17 (4th Cir. 1980); *Forrestal Vill., Inc. v. Graham*, 551 F.2d 411, 413 (5th Cir. 1977).

Recognizing the need to "minimize 'uncertainty and time-consuming litigation'" inherent in that approach, our Court was the first to advocate and adopt uniform limitations periods for § 10(b) claims. *In re Data Access Sys. Sec. Litig.*, 843 F.2d 1537, 1543 (3d Cir. 1988) (*en banc*) (quoting *Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 348 (3d Cir. 1986)). In *Data Access* we determined that using the limitations periods set out in other sections of the Securities Exchange Act

would lead to the uniformity and certainty desired. Specifically, we adopted the one-year statute of limitations and the three-year statute of repose[6] that was prevalent throughout the Securities Exchange Act for the express rights of action that the legislation *did* create (*e.g.,* §§ 9(e), 18(c), and 29(b)). Three years later, in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, the Supreme Court approved this framework. 501 U.S. 350, 358–62 (1991). Specifically, the Court adopted the limitations periods found in § 9(e) of the Securities Exchange Act as the controlling provision. *Id.* at 364 n.9. Soon after the Court's approval of our *Data Access* decision, we extended its reasoning to § 14(a) claims as well. *See Westinghouse Elec. Corp. v. Franklin*, 993 F.2d 349, 353 (3d Cir. 1993).

At the time of the events described in plaintiffs' complaint, this is where the law stood: for securities claims

---

[6]A statute of limitations is "[a] law that bars claims after a specified period." BLACK'S LAW DICTIONARY 1450 (8th ed. 2004) [hereinafter BLACK'S]. It is generally subject to a "discovery rule," meaning that it does not begin to run until the plaintiff is aware (or should be aware) of his claim. A statute of repose is "[a] statute barring any suit that is brought after a specified time since the defendant acted." *Id.* at 1451. It is generally not subject to a discovery rule. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 363 (1991). Further material differences between statutes of limitations and repose are discussed in Part II.B., *infra*.

13

brought under §§ 10(b) and 14(a), the limitations periods consisted of a one-year statute of limitations and a three-year statute of repose. On July 30, 2002, however, the Public Company Accounting Reform and Investor Protection Act of 2002—better known as the Sarbanes-Oxley Act or, simply, Sarbanes-Oxley—was enacted. Pub. L. No. 107-204, 116 Stat. 745. In relevant part, Sarbanes-Oxley extended the limitations periods for "private right[s] of action that involve[] a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws." *Id.* § 804(a), 28 U.S.C. § 1658(b). Such actions now have the benefit of a two-year statute of limitations and a five-year statute of repose. *Id.*

Because of the timing of both the underlying events and the filing of this case, we have a perfect storm of issues concerning the timeliness of plaintiffs' complaint. For any of their claims to be ruled timely, each of the following three conditions must be met:

> (1) Sarbanes-Oxley's timing extensions must apply retroactively to these claims, even though the underlying violation had already taken place when that legislation was enacted;[7]

---

[7]This is the question left open by our decision in *Lieberman v. Cambridge Partners, L.L.C.*, 432 F.3d 482, 488 (3d Cir. 2005) ("We do not decide . . . whether Congress intended Section 804

14

(2) the statute of repose must begin as of the date of the merger (Nov. 30, 1999) between Exxon and Mobil, not the date that the joint proxy statement was issued (Mar. 26, 1999); and

(3) the statute of limitations must not have begun to run until on or after February 17, 2002 (two years prior to filing the complaint), leaving only the statute of repose as the limitations period of any material concern.

What this means is that if Sarbanes-Oxley does not apply to any given claim raised by plaintiffs (#1 above), then, by any calculation, § 9(e)'s three-year statute of repose ran out over a year before plaintiffs filed this suit.



Additionally, if the repose period started on the date of the proxy statement rather than the date of the merger (#2 above), the five-year time-frame provided by Sarbanes-Oxley would not apply here. This is because Sarbanes-Oxley was passed more than three years after the proxy statement was issued, and we have

[of Sarbanes-Oxley] to have a general retroactive effect.").

15

already held that it did not revive previously extinguished claims. *See Lieberman v. Cambridge Partners, L.L.C.*, 432 F.3d 482, 488–92 (3d Cir. 2005). Thus, the pre-Sarbanes-Oxley three-year statute of repose would operate to bar plaintiffs' claims.



And finally, if plaintiffs became aware (or should have become aware) that the proxy statement was false, misleading, or fraudulent before February 17, 2002, then the statute of limitations would operate independently to bar their claims (#3 above).

### A. Application of Sarbanes-Oxley in this Case

#### 1. Can Sarbanes-Oxley's longer limitations periods apply to any of the claims raised in plaintiffs' complaint?

To repeat, in *Lieberman* we held that the lengthier limitations periods provided by Sarbanes-Oxley did not apply to claims that had expired under the limitation periods in place prior to the passage of that legislation, even if the claims were filed after its enactment and would be timely under its

provisions. 432 F.3d at 488–92. We explicitly reserved the question, however, whether that Act lengthened the limitations periods for claims on which the periods were already running but had not yet expired. *Id.* at 488.

Though there is a "presumption against retroactive legislation [that] is deeply rooted in our jurisprudence," *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994), it is also the case that if Congress has expressly provided for retroactive effect, a court must "enforce[] the statute as written," *Lieberman*, 432 F.3d at 488. As noted above, in § 804(b) of Sarbanes-Oxley Congress explicitly stated that "[t]he limitations period[s] provided by section 1658(b) of title 28, United States Code, as added by this section, shall apply to all proceedings addressed by this section that are commenced on or after the date of enactment of this Act." 116 Stat. 801. Congress used the terms "proceedings . . . that are commenced" instead of "claims that accrue" or similar such language. The plain meaning of these words directs that claims filed after July 30, 2002, receive the benefit of the extended limitations periods, even if the shorter periods had already begun (but had not expired) on the underlying causes of action. Hence, the types of claims listed in 28 U.S.C. § 1658(b) and raised in suits with timing like this one—filed in 2004 but complaining of events in 1999—get the benefit of Sarbanes-Oxley's two-year statute of limitations and five-year statute of repose. The lingering question, though, is whether each of plaintiffs' claims here is in fact within the scope of 28 U.S.C. § 1658(b).

17

## 2. Which of plaintiffs' claims benefit from the extended limitations periods provided by Sarbanes-Oxley?

There can be no question that 28 U.S.C. § 1658(b) covers claims based on § 10(b) of the Securities Exchange Act. The statute refers explicitly to "private right[s] of action that involve[] a claim of fraud . . . in contravention of . . . the securities laws." 28 U.S.C. § 1658(b). Indeed, the implied cause of action recognized under § 10(b) is widely known and referred to as "securities fraud." *See, e.g.*, Insider Trading and Securities Fraud Enforcement Act of 1988, Pub. L. 100-704, 102 Stat. 4681; *Lampf*, 501 U.S. at 376. To conclude that § 1658(b) does not apply to § 10(b) claims would be absurd.

But does § 1658(b) also apply to plaintiffs' § 14(a) claim? Section 1658(b), by its terms, applies to claims that "involve[] . . . fraud, deceit, manipulation, or contrivance." This wording closely tracks the language of § 10(b), which prohibits employing "any manipulative or deceptive device or contrivance." Violations of § 14(a), on the other hand, may be committed without scienter; in other words, no culpable intent is required. *See Cal. Pub. Employees' Ret. Sys. v. The Chubb Corp.*, 394 F.3d 126, 143–44 (3d Cir. 2004) ("In contrast to section 10(b) . . . , scienter is not a necessary element in alleging a section 14(a) claim."). For liability to attach under § 14(a), all that is required is that a proxy statement be "false or misleading with respect to any material fact." 17 C.F.R. § 240.14a-9(a).

18

Given this material distinction, we conclude that Congress did not intend to include § 14(a) claims within the scope of § 1658(b), but rather intended that provision to apply to § 10(b) claims and other claims requiring proof of fraudulent intent.[8] Several district courts have done the same analysis and reached the same conclusion when deciding § 1658(b)'s relevance to § 14(a) and other securities-related claims. *See Virginia M. Damon Trust v. N. Country Fin. Corp.*, 325 F. Supp. 2d 817, 822–24 (W.D. Mich. 2004) (holding that § 1658(b) does not apply to claims brought under § 14 of the Securities Exchange Act); *In re Global Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 196–98 (S.D.N.Y. 2003) (same);[9] *cf. In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 412–18 (S.D.N.Y. 2005)

[8]A plain reading of Rule 10b-5 would suggest that § 10(b) claims likewise do not always require proof of scienter. *See* 17 C.F.R. § 240.10b-5(b) (making it unlawful simply to "make any untrue statement of a material fact"). The Supreme Court, however, has ruled that despite Rule 10b-5's apparent breadth, it cannot reach conduct beyond that covered by the text of 15 U.S.C. § 78j(b), which clearly requires fraudulent intent. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 212–14 (1976).

[9]The *Global Crossing* Court was the first to analyze this question in any detail. In addition to the textual and logical reasons for its conclusion, that Court noted that the limited legislative history also lent some support. *See In re Global Crossing*, 313 F. Supp. 2d at 197 n.6; *see also In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 402, 415 (S.D.N.Y. 2005).

19

(holding the same for §§ 11, 12(a)(a), and 15 of the Securities Act of 1933); *In re Firstenergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 601 (N.D. Ohio 2004) (§§ 11 and 12(a)(2) of the Securities Act of 1933); Amy Grynol Gibbs, Note, *It's About Time: The Scope of Section 804 of the Sarbanes-Oxley Act of 2002*, 38 GA. L. REV. 1403 (concluding that § 1658(b) does not apply to claims under § 11 of the Securities Act of 1933).

Plaintiffs, as a fall-back position, next argue that even if § 14(a) claims are not necessarily based in fraud (and thus would not generally get the benefit of § 1658(b)'s extended statute of limitations), their particular § 14(a) claim does sound in fraud and therefore does fall within the scope of § 1658(b). Lending some support to this notion—that we should look at claims in a practical manner, not a "categorical" one—is that, under our precedent, if a claim not otherwise requiring proof of scienter nonetheless sounds in fraud, then Federal Rule of Civil Procedure 9(b)'s heightened pleading standard applies.[10] *See Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 287–89 (3d Cir. 1992); *see also Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004). Plaintiffs therefore ask whether it is fair that the same thinking that is used to impose Rule 9(b) burdens on their § 14(a) claim (sounding in fraud) be used to deny them the benefits of § 1658(b), which applies to fraud claims.

---

[10]The Rule, in relevant part, provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

20

Plaintiffs' focus on perceived fairness is misplaced. Rather, as we did when deciding *Shapiro*, we focus on the policy choice of Congress as shown by the text and purpose of the applicable law. First, the text of Rule 9(b) supported our conclusion in *Shapiro* because, by its terms, the rule applied to "averments" (*i.e.*, allegations to be backed up with evidence). Section 1658(b), however, refers to "right[s] of action." This distinction is significant because "averments," when assembled, are what constitute "right[s] of action," and a statute using the latter term—like § 1658(b)—necessarily applies at a higher level of generality than a statute using the former term—like Rule 9(b). This point was not lost on us in *Shapiro*. *See* 964 F.2d at 288 ("Rule 9(b) refers to 'averments' of fraud, and thus requires us to examine the actual allegations that support a particular legal claim."). Second, pleading with specificity, as required by Rule 9(b), is intended to give defendants more certainty as to the charges they must defend. *Rombach*, 355 F.3d at 171. As with that policy choice made for the benefit of defendants, so too does the policy choice of Congress to establish firm deadlines for securities fraud claims help defendants. Allowing plaintiffs effectively to bypass this policy judgment—and thereby select the length of the limitations periods that will apply to a claim merely by sounding their § 14(a) claim in fraud—would not promote the principal reason for having time-bars: certainty for defendants. We therefore see no reason to transpose our ruling in *Shapiro* to this case.

In ruling that § 14(a) claims do not fall within the scope

21

of § 1658(b), we recognize that this severs the tie between the limitations periods applicable to § 10(b) claims and § 14(a) claims that we recognized in *Westinghouse*. *See* 993 F.2d at 352–54 (holding that the same statute of limitations periods that applied to claims under § 10(b) also apply to those under § 14(a)). Plaintiffs make much of this link in their filings before us. But the law has materially changed since our decision in *Westinghouse*, and to use its policy arguments to claim otherwise ignores what has happened since.

As explained above, in the absence of express limitations periods for the § 14(a) implied right of action, *Westinghouse* naturally relied on § 10(b)'s similar objectives—"fair corporate suffrage" and "protect[ing] investors"—when deciding it could use as well the same method (set out in *Data Access*, approved in *Lampf*) when determining the time-bar for § 14(a) claims. *Id.* at 353. *Westinghouse* did not say that the limitations periods for § 14(a) claims are, by their nature, the same as those for § 10(b) claims. Rather, that case held that in the absence of any explicit congressional command, there was good reason to think that Congress would want § 14(a) claims—just as much as § 10(b) claims—to be the same as every other securities claim. Thus, the link established by *Westinghouse* for § 14(a) claims was not to § 10(b), but instead (as with § 10(b) itself) to other causes of action in the securities laws.

When it comes to § 10(b) claims, though, there is now a new consideration—namely, express limitations periods set by

22

a law that did not previously exist. That Congress has now provided explicit, extended limitation periods for fraud-based claims, such as those brought under § 10(b), is not cause to alter the way we determine the applicable limitation periods for § 14(a) claims, which need not be fraud-based and, thus, still do not have express limitation periods. Though *Data Access* and *Lampf* have now been superseded by Sarbanes-Oxley as they relate to the time limitations on § 10(b) claims, nothing in that legislation indicates Congress's desire to supersede the rationale of those cases as applied in *Westinghouse* with respect to § 14(a) claims.

We hold that 28 U.S.C. § 1658(b) applies to claims under 15 U.S.C. § 78j(b) (*i.e.*, § 10(b) claims), but not to claims under 15 U.S.C. § 78n(a) (*i.e.*, § 14(a) claims). Because plaintiffs filed their complaint over four years after the merger between Exxon and Mobil,[11] the previously applicable three-year statute of repose still applies and serves as a bar to their § 14(a) claim. Only plaintiffs' § 10(b) claim, therefore, has the potential to be viable given the facts here, and we thus continue with that claim alone down the timing gauntlet.

---

[11]Whether the merger date, in fact, marks the proper date on which to start running the statute of repose is the focus of the next section. That date, however, is the latest any party claims that the statute of repose began to run.

23

**B. When do §§ 9(e)'s and 1658(b)'s statutes of repose begin to run?**

As described above, the limitations period established by 28 U.S.C. § 1658(b) for securities fraud claims consists of a "two-year/five-year" scheme; the pre-Sarbanes-Oxley set up, taken from § 9(e) of the Securities Exchange Act, sported a "one-year/three-year" scheme, but was identical to § 1658(b) in all other material respects. Under both systems, courts have consistently referred to the shorter time period as a statute of limitations and the longer period as a statute of repose. *See, e.g.*, *Lampf*, 501 U.S. at 360, 362, 363; *Tello v. Dean Witter Reynolds, Inc.*, No. 03-12545, ___ F.3d ___, 2007 WL 2141701, at *6 (11th Cir. July 27, 2007); *Margolies v. Deason*, 464 F.3d 547, 551 (5th Cir. 2006). The question we address here is when did § 9(e)'s and § 1658(b)(2)'s statutes of repose begin to run—at the time of Exxon's alleged misrepresentation (the March 1999 proxy statement)[12] or at the time its merger with

---

[12]Like Exxon's Form 10-K, which was incorporated into the March 26, 1999, proxy statement, Exxon filed several Form 10-Qs with the same alleged misrepresentation regarding impaired assets. We reject plaintiffs' assertion that these Form 10-Qs are relevant to our discussion. Securities fraud requires that a misrepresentation be "*in connection with* the sale or purchase of any security." 15 U.S.C. 78j(b) (emphasis added); *see also* 17 C.F.R. § 240.10b-5. The "sale" here is, of course, the merger requiring the exchange of Mobil shares for shares of

Mobil was consummated (late November 1999). If it is the former, then the three-year statute of repose provided by § 9(e) serves to bar plaintiffs' § 10(b) claim, as that period would have expired four months before Sarbanes-Oxley became law. (Again, under our precedent, Sarbanes-Oxley did not revive previously extinguished claims. *See Lieberman*, 432 F.3d at 488–92.)

A statute of repose bars "any suit that is brought after a specified time since the defendant acted . . . , *even if this period ends before the plaintiff has suffered a resulting injury*." BLACK'S at 1451 (emphasis added). Unlike statutes of limitations, which traditionally do not begin to run until a cause of action has accrued (*i.e.*, when all required elements have occurred) and the onset of which is often subject to delay by late discovery of the injury (or when a reasonable person should have discovered it), statutes of repose start upon the occurrence of a specific event and may expire before a plaintiff discovers he has been wronged or even before damages have been suffered at all. *Accord Nesladek v. Ford Motor Co.*, 46 F.3d 734, 737 n.3 (8th Cir. 1995) ("A statute of repose is different from a statute of limitations . . . because a tort limitations statute

ExxonMobil. *See Kahan v. Rosenstiel*, 424 F.2d 161, 171 n.10 (3d Cir. 1970). Whatever statements Exxon may have made in its subsequent Form 10-Qs, they were not "in connection with" the exchange of shares at the merger. Only the proxy statement served this function.

does not begin to run until the injury, death, or damage occurs—or until the cause of action accrues. On the other hand, a statute of repose prevents the cause of action from accruing in the first place."); ADOLPH J. LEVY, SOLVING STATUTE OF LIMITATIONS PROBLEMS § 3.01, at 76 (1987). It might be said that statutes of repose pursue similar goals as do statutes of limitations (protecting defendants from defending against stale claims), but strike a stronger defendant-friendly balance. Put more bluntly, there is a time when allowing people to put their wrongful conduct behind them—and out of the law's reach—is more important than providing those wronged with a legal remedy, even if the victims never had the opportunity to pursue one.

Thus, while it is true that for a § 10(b) claim to "accrue" there must be an exchange of securities (here, the November 1999 consummation of the merger)[13], *see Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341 (2005), and only then do plaintiffs suffer any actual injury, nevertheless the specific acts targeted by a § 10(b) cause of action are fraudulent statements themselves. It therefore is more consonant with the traditional understanding of how a statute of repose functions for the repose periods of § 9(e) and § 1658(b)(2) to begin from the date of Exxon's alleged misrepresentation: the March 26, 1999, proxy statement.

---

[13]*But see infra* note 14.

26

Supporting this view is the text of the relevant statutes themselves, especially in relation to the limitations periods applicable to other causes of action provided by the Securities Exchange Act. Notably, § 9(e) and § 1658(b)(2) set their statutes of repose relative to the "violation," not to the "accrual," of the cause of action. In light of our discussion above, this word choice is important. Coupled with the observation that the repose periods associated with other causes of action provided by the same Act do use the term "accrue," *see, e.g.*, 15 U.S.C. § 78r(c) (§ 18 of the Act), this suggests that Congress knew that the terms carried different meanings.

The Supreme Court has also weighed in, although only in a *dictum*. The concluding line of *Lampf*, which disposes of the case, reads: "As there is no dispute that the earliest of plaintiff-respondents' complaints was filed more than three years after petitioner's alleged *misrepresentations*, plaintiff-respondents' claims were untimely." *Id.* at 364 (emphasis added). As the misrepresentations in *Lampf* occurred at about the same time as the exchange of securities, whether the date to begin running the statute of repose is the date of the misrepresentation was not necessary to the Court's decision. Nonetheless its focus was on the alleged misrepresentation, not the exchange of securities.

For the reasons set out above—the traditional understanding of how statutes of repose function, the text of §§ 9(e) and 1658(b)(2), and a Supreme Court *dictum*—we hold

27

that the repose period applicable to § 10(b) claims as set out in §§ 9(e) and 1658(b)(2) begins to run on the date of the alleged misrepresentation.[14]

---

[14]Even if we were to conclude that the statute of repose should be calculated from when plaintiffs' Mobil shares were exchanged for shares in ExxonMobil, this suit might still be time-barred. This is because one view holds that an "exchange" of securities occurs not on the date they formally change hands, but rather the date the parties become *committed* to exchange the securities. *Grondahl v. Merritt & Harris, Inc.*, 964 F.2d 1290, 1294 (2d Cir. 1992); *Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 890–91 (2d Cir. 1972); *Hill v. Equitable Bank*, 655 F. Supp. 631, 638 (D. Del. 1987), *aff'd sub nom. Hill v. Equitable Trust Co.*, 851 F.2d 691 (3d Cir. 1988). Determining the date of the relevant investment decision requires a "close examination of the documents relevant to the formation" of the exchange agreement, *Hill*, 655 F. Supp. at 638, to determine "when parties to the transaction are committed to one another," *Radiation Dynamics*, 464 F.2d at 891. For a case using this approach, see *In re Colonial Ltd. P'ship Litig.*, 854 F. Supp. 64, 84–85 (D. Conn. 1994).

Regardless whether we would adopt this approach, it is unclear how it would apply in this case. Here, shareholders approved the merger of Exxon and Mobil on May 27, 1999. If that date is used as the date of "exchange," then, just as is the case under our holding here, the formerly applicable three-year statute of repose would have expired before the passage of Sarbanes-Oxley in July 2002, and plaintiffs' § 10(b) claim would not have been revived by that legislation. *See Lieberman*,

Plaintiffs counter the analysis underlying this holding with a single case: *Baron v. Allied Artists Pictures Corp.*, 717 F.2d 105 (3d Cir. 1983). In *Baron* we were presented with the question of when the then-applicable Delaware statute of limitations began to run for a § 14(a) claim for damages. We began our analysis by stating that "[i]t is a rule of general application that a cause of action for the recovery of damages accrues only when it could be prosecuted to a successful conclusion." *Id.* at 108. We then distinguished between an action seeking injunctive relief and one for damages. In a damages action, we said, the statute of limitations cannot begin to run until the plaintiff has been injured—*i.e.*, until damages have been suffered. *Id.* at 108–09. Plaintiffs here argue that because they are seeking damages, the limitations period, pursuant to *Baron*, cannot begin running until the merger date, for that is when their damages were suffered and, therefore, when the alleged tort of securities fraud was completed by the exchange of securities (from Mobil to ExxonMobil).

In light of our discussion on this issue, though, *Baron* is

---

432 F.3d at 488–92. On another view though, the merger context may require a more nuanced analysis. The necessity of gaining approval from various governmental agencies, as well as the possible existence of escape clauses in the merger agreement itself, may delay the time when the parties may properly be considered "committed." Given our holding here, we need not consider this question.

readily distinguishable: because it was decided under the pre-*Data Access*/pre-*Lampf* framework, it dealt only with a statute of limitations as borrowed from Delaware law. *Baron* had no occasion to consider the effect of a statute of repose on its holding. It is possible that *Baron* yet has currency when it comes to the statute of limitations periods provided in §§ 9(e) and 1658(b)(1), but we leave that question for another day.[15]

---

[15]Because *Baron* applied federal law when determining when the statute of limitations began (in contrast to its use of state law to set the length of the limitations period itself), there is no obvious reason why its holding would have been affected by *Data Access*, *Lampf*, or Sarbanes-Oxley. Moreover, as our discussion at the beginning of this section would suggest, *Baron* is consistent with the general understanding about when a statute of limitations begins to run: upon accrual of the cause of action (*i.e.*, when each element is complete) or when a reasonable person would have known that he had a cause of action. With the tort of securities fraud, this includes an exchange of securities and in the merger context may not occur until the merger is finally consummated. *But see supra* note 14. *Baron*'s logic, therefore, may still apply when calculating §§ 9(e)'s and 1658(b)(1)'s statutes of limitations.

We note, however, that, like § 1658(b)(2), the terms of § 1658(b)(1) also refer to a "violation." Likewise with § 9(e). To say that the statute of limitations begins at a different time than the statute of repose would require the same word to have two meanings within the same statutory provision—a significant textual mountain to climb. One District Court in this Circuit has

Because the statute of repose applicable to § 10(b) claims begins to run on the date of the alleged fraudulent statement, plaintiffs here, under *Lieberman*, 432 F.3d at 488–92*, cannot benefit from Sarbanes-Oxley's extension of the statute from three years to five, as any such claim based on Exxon's March 26, 1999, proxy statement became time-barred on March 26, 2002, over four months before Sarbanes-Oxley became law. The District Court was correct to dismiss their § 10(b) claim as untimely.

*     *     *     *     *

Because 28 U.S.C. § 1658(b) does not apply to § 14(a) claims, count one of plaintiffs' suit is time-barred, and the District Court was correct to dismiss it. Additionally, because the statute of repose applicable to § 10(b) claims begins to run on the date of an alleged misrepresentation, count two of plaintiffs' suit is time-barred, and the District Court was correct in dismissing it as well. Finally, because plaintiffs' § 20(a) claim against Raymond is predicated on the existence of another

refused the challenge, concluding that both the statute of limitations and statute of repose begin as of the date of an alleged misrepresentation. *In re Phar-Mor, Inc. Sec. Litig.*, 892 F. Supp. 676, 686–88 (W.D. Pa. 1995). How to reconcile the text of § 1658(b)(1) with *Baron* and with the traditional understanding of when a statute of limitations begins to run is an undertaking we need not yet attempt.

31

valid securities claim (and, as noted, none exist), the District Court again was correct to dismiss that claim. For these reasons, the judgment of the District Court is affirmed.[16]

---

[16]Given these holdings, we need not address whether plaintiffs' claims were barred by the applicable statute of limitations or whether their § 10(b) claim was adequately pleaded under Rule 9(b) and the PSLRA. We note, however, that were we to reach the latter issue, we have doubt that the § 10(b) claim was adequately pleaded, as few of plaintiffs' allegations raise the requisite "strong inference" that Exxon acted fraudulently.