In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-1459

DENISE MCCANN,

*Plaintiff-Appellant*,

*v.*

HY-VEE, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 09 C 5984—**John A. Nordberg**, *Judge*.

ARGUED SEPTEMBER 22, 2011—DECIDED NOVEMBER 22, 2011

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

POSNER, *Circuit Judge*.   This appeal concerns statutory deadlines for filing federal securities suits, in the somewhat unusual context of a divorce. The district judge dismissed the suit with prejudice on the ground that it was time-barred. The principal question raised by the appeal is whether the period in which a private suit for a federal securities violation may be brought begins with the fraud or other misconduct on which the suit is

based or not until a harm befalls the plaintiff from the misconduct. The Supreme Court has thus far declined to answer the question. See *Merck & Co. v. Reynolds*, 130 S. Ct. 1784, 1796 (2010). (It noted the government's position that the time begins to run on the earlier date. *Id*.)

The plaintiff, Denise McCann, and her husband, Anthony McCann, divorced in August 2002. He was an executive of a closely held corporation called Hy-Vee, a super-market chain that is the defendant in this case. He was paid a salary of $300,000 a year and also owned common stock in the corporation. The divorce decree transferred to his wife almost a third of his shares of stock "until such time as [he] is first able to sell" them. The decree also required him to pay both alimony and child support through May 2007—when the couple's youngest child would finish high school—and to continue paying alimony until August 2012 unless he managed to sell the shares before then and forwarded the proceeds to Denise. At that point the alimony obligation would end, as she would then have the cash proceeds of the sale of the stock to live on.

The suit charges Hy-Vee with defrauding Denise as a favor to her husband—that during the negotiations leading up to the divorce Hy-Vee's chief financial officer told her falsely that her husband's shares could be sold only if he died, ceased to be employed by Hy-Vee, or ceased being employed in a position that entitled him to buy stock in the company (for example by being de-moted). He told her that until one of those things hap-pened she could not be dispossessed of the shares—and

unless she was dispossessed of them before August 2012 her alimony would continue until then. In fact, the complaint alleges, Anthony could at any time obtain the company's permission to sell the stock forthwith. But the CFO's false assurance persuaded Denise (she argues) both to accept the stock in lieu of a cash settlement and to agree that her alimony payments would terminate as soon after May 2007 as Anthony was first allowed to sell the stock.

Although none of the triggering events listed by the CFO occurred, Hy-Vee on June 12, 2007—less than two weeks after the earliest day on which Anthony could stop paying alimony to Denise—agreed to buy back the shares that had been transferred to her. The price (rounded to the nearest $1,000) was $908,000. Anthony mailed her a check for $709,000, explaining that the difference between that amount and the larger amount he had received from the company represented taxes and overpayment. He demanded the shares in return. She refused and her refusal precipitated state court litigation, which she lost, finally surrendering the shares in January 2008 and receiving in exchange $712,000. (The increase over the original figure of $709,000 probably was seven months' interest on the $709,000.) Anthony also stopped making alimony payments when Hy-Vee agreed to buy the shares in June 2007, depriving Denise of $220,500 that she would have received through August 2012 had the shares not been sold by then.

Denise filed the present suit on September 25, 2009, charged Hy-Vee with having violated section 10(b) of the

Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and the SEC's Rule 10b-5, 17 C.F.R. § 240.10b-5, by making misrepresentations in connection with her receipt and sale of Hy-Vee stock. Section 10(b) forbids deceptive conduct "in connection with the purchase or sale of" a security, and Rule 10b-5 prohibits the making of any "untrue statement of a material fact" or omission of any material fact "necessary . . . to make the statements made . . . not misleading." Anthony was not joined as a defendant. The district court, as we said, dismissed the suit as untimely.

As an alternative ground of dismissal, Hy-Vee argued in the district court (and no doubt would renew the argument if we reversed the dismissal of the suit, as the district court left the issue open) that there was no purchase or sale of stock because Denise never bought or sold Anthony's shares but merely "held" them until Anthony decided to sell. We disagree. When Anthony made the sale of the stock to the corporation in 2007, he was acting on behalf of Denise in the sense that the amount he received in the sale, after adjustments, went to Denise rather than being retained by him. In effect she sold the stock to the corporation for that amount, albeit involuntarily.

True, the sale that was made in reliance on the misrepresentation was the 2002 "sale" of the shares to Denise pursuant to the divorce decree (the 2007 sale by Anthony on her behalf was not in reliance on the misrepresentation but rather was a consequence of the terms of the earlier sale), and the 2002 transaction was not labeled a sale. But

realistically that's what it was. Denise received securities and paid for them by giving up a demand for other concessions in the divorce decree, such as a longer period of alimony—a surrender that constituted valuable consideration for the shares. Cf. *Farid-Es-Sultaneh v. Commissioner*, 160 F.2d 812, 815 (2d Cir. 1947). No more was necessary to satisfy the statutory requirement of a purchase or sale of a security. See *SEC v. Zandford*, 535 U.S. 813, 819-20 (2002); *Norris v. Wirtz*, 719 F.2d 256, 259-60 (7th Cir. 1983); *Smith v. Pennington*, 352 F.3d 884, 889 (4th Cir. 2003); *James v. Gerber Products Co.*, 483 F.2d 944, 948 (6th Cir. 1973).

So we come to the issue of timeliness. It is governed by 28 U.S.C. § 1658(b), *Merck & Co. v. Reynolds*, *supra*, 130 S. Ct. at 1789-90; *Foss v. Bear, Stearns & Co.*, 394 F.3d 540, 541-52 (7th Cir. 2005), the two subsections of which provide that a private suit for federal securities fraud "may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." The district court relied on subsection (2) in deciding to dismiss the suit, but the defendant argues that it is barred by subsection (1) as well, and this is probably true. Although Denise had no reason in 2002 to doubt what Hy-Vee's chief financial officer told her were the limited conditions under which Anthony could sell the stock out from under her—Hy-Vee doesn't argue that prudence required her to demand documentary proof of the truthfulness of the CFO's statement to her—she probably discovered that she had been had when she learned that her husband had been authorized to sell the stock

even though none of the triggering events that the chief
financial officer had mentioned to her had occurred. She
learned that in June 2007 and didn't sue until 27 months
later—three months too late. She got the check from
Anthony, not from Hy-Vee, and claims not to have
known that he'd sold the stock. But this is unlikely, and
it is especially unlikely that had she been diligent she
still would have failed to realize that Hy-Vee was pur-
chasing the stock from Anthony—and the two-year
time limit in section 1658(b)(1) begins to run when the
plaintiff would have discovered the violation had she
been diligent. *Merck & Co. v. Reynolds*, *supra*, 130 S. Ct. at
1797-98. (As a detail, we note that *Merck*, 130 S. Ct. at 1797-
98, disapproved decisions of ours, such as *Tregenza v.
Great American Communications Co.*, 12 F.3d 717, 722
(7th Cir. 1993), which had held that the two-year period
begins to run even earlier—upon "inquiry notice," which
means as soon as the plaintiff discovers facts that while
not constituting a violation create enough suspicion of
one to induce a diligent person to investigate further
and by doing so discover it.)

But the district judge made no findings with regard to
subsection (1), instead ruling that the suit was barred by
subsection (2), which gives the plaintiff five years
rather than two in which to sue but makes the period
run from the violation rather than from its discovery.
The question, which is a question under subsection (1) as
well, is what "violation" means. Does it mean when the
fraud was committed or when the fraud caused a loss?
In other words, is section 1658(b) (and specifically its
second subsection) a statute of limitations or a statute

of repose? "A period of limitation bars an action if the plaintiff does not file suit within a set period of time from the date on which the cause of action accrued. In contrast, a period of repose bars a suit a fixed number of years after an action by the defendant (such as manufacturing a product), even if this period ends before the plaintiff suffers any injury." *Beard v. J.I. Case Co.*, 823 F.2d 1095, 1097 n. 1 (7th Cir. 1987); see also *Roskam Baking Co. v. Lanham Machinery Co.*, 288 F.3d 895, 903-04 (6th Cir. 2002). So imagine a case in which a defective product is sold at time *t*, the defect causes an accident at *t* + 10, but the deadline for suit is *t* + 5. E.g., *Chang v. Baxter Healthcare Corp.*, 599 F.3d 728, 733 (7th Cir. 2010). Such a deadline creates a period of repose, barring suit even though the victim of an accident caused by the defective product could not, however diligent or well informed, have sued within the deadline because the accident didn't occur until after the deadline had passed.

A statute of repose is strong medicine, precluding as it does even meritorious suits because of delay for which the plaintiff is not responsible. "[A]s opposed to a statute of limitations, which begins running upon the accrual of some claim and permits equitable exceptions, . . . a statute of repose . . . 'serves as an unyielding and absolute barrier' to a cause of action, regardless of whether that cause has accrued." *Klein v. DePuy, Inc.*, 506 F.3d 553, 557 (7th Cir. 2007). "The rule in the federal courts is that both tolling doctrines—equitable estoppel and equitable tolling—are . . . grafted on to federal statutes of limitations," but

"neither tolling doctrine applies to statutes of repose; their very purpose is to set an outer limit unaffected by what the plaintiff knows." *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 451 (7th Cir. 1990).

The argument for so unbending a rule is that the risk of error is great when the interval between an alleged wrongful act and its harmful consequence is a protracted one. The argument is particularly strong in the case of product defects, but it applies to securities fraud as well. Suits for securities fraud can, as in this case, be based on oral statements, which are difficult to verify after several years have passed. The causal relation between a misleading statement and a change in the price of a security is also more difficult to determine the longer the interval. And business planning is impeded by contingent liabilities that linger indefinitely.

The plaintiff argues that there was no "violation" to trigger the statute of repose until 2007, when the defendant agreed to buy the stock, thus extinguishing Anthony's alimony obligations and so causing Denise's injury. Indeed the *injury* from the alleged fraud did not occur until then—until, that is, Anthony sold the stock before any triggering event listed by the CFO occurred, thus cutting off the payment of alimony to Denise. But to argue that the injury is an element of the violation would (if the argument prevailed) make section 1658(b) a statute of limitations rather than a statute of repose, since there is no tort without an injury, whether a common law tort, *Rozenfeld v. Medical Protective Co.*, 73 F.3d 154, 155-56 (7th Cir. 1996); *Bastian v. Petren Resources*

*Corp.*, 892 F.2d 680, 684 (7th Cir. 1990), or a federal statutory tort. E.g., *Blue Cross & Blue Shield United v. Marshfield Clinic*, 152 F.3d 588, 592 (7th Cir. 1998); *Kanar v. United States*, 118 F.3d 527, 531 (7th Cir. 1997). There can be questions about what constitutes an injury; in *Delaware State College v. Ricks*, 449 U.S. 250 (1980), the Supreme Court held that termination of a teacher's tenure contract was an injury that started the statute of limitations for employment discrimination running even though the teacher was given a year to find another job. But the principle is secure: there is no tort without an injury and if the period in which a tort suit can be brought runs from the date of the tort, it is a period prescribed by a statute of limitations rather than by a statute of repose.

If section 1658(b) were a statute of limitations (and assuming that "violation" means the same thing in both subsections), a person who had bought a security could, having later discovered that he'd been defrauded, wait indefinitely to determine whether his purchase had been a mistake (because of the fraud) or a windfall (because despite the fraud the price of the security had risen beyond expectations), since his two-year period under subsection (1) would not begin to run until the fraud caused him harm. This would be a heads I win, tails you lose, proposition, which the law would be unlikely to countenance. *Short v. Belleville Shoe Mfg. Co.*, 908 F.2d 1385, 1392 (7th Cir. 1990).

That is an example from subsection (1). Interpreting "violation" in subsection (2) to mean the completed tort

would produce its own anomalies. Imagine a person who bought General Motors stock in 1935 allegedly on the basis of a deliberately false oral assurance, communicated privately by a GM official, that GM would never bargain with a union. In 2009, when GM goes bankrupt, at least in part because of contracts it had negotiated with the auto workers union governing health benefits, the buyer's granddaughter (his heir) sues for securities fraud. The alleged misrepresentation, having been private, did not affect the stock price until (let us say) 2008, and so any harm from it did not occur until then. If the five-year deadline of subsection (2) began its count down in 2008, the outer limit for suing would be 2013—78 years after the alleged misrepresentation was made—if "violation" in section 1658(b)(2) is the completed statutory tort.

A bit of further evidence that "violation" in section 1658(b) does not require injury is that the SEC can bring an enforcement action for a "violation" of federal securities law without anyone having suffered harm, which is to say without anyone having relied on a misrepresentation or misleading omission to his detriment. *Schellenbach v. SEC*, 989 F.2d 907, 913 (7th Cir. 1993); *SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1363-64 and n. 4 (9th Cir. 1993). This evidence of the meaning of the word in section 1658(b) is not conclusive, however, because although the SEC doesn't have to prove reliance on a misrepresentation, a private party would have to, as otherwise he would have suffered no injury, *Basic, Inc. v. Levinson*, 485 U.S. 224, 243 (1988); *Astor Chauffeured*

*Limousine Co. v. Runnfeldt Investment Corp.*, 910 F.2d 1540, 1546 (7th Cir. 1990), yet there is no mention of reliance or injury in either section 10(b) of the 1934 Act or Rule 10b-5. But the addition of these elements to the private suit is perhaps better viewed as a judicial graft necessary to make the statute and the rule function as the source of an implied private right of action than as an interpretation of the word "violation."

Another argument for treating the statute as a statute of repose is that the starting gate in statutes of limitations is usually expressed as the date on which "such claim accrues," *United States v. Kubrick*, 444 U.S. 111, 113 (1979), or "the date on which the cause of action arose," *Bay Area Laundry & Dry Cleaning Pension Trust Fund v. Ferbar Corp.*, 522 U.S. 192, 198 (1997), or similar language, rather than the date of "violation."

But legislation is not noted for consistent terminology, and it is the practical considerations that we've discussed that persuade us that section 1658(b)(2) (subsection (1) as well, but we're not ruling on the application of (1) to this case) is best regarded as a statute of repose rather than as a statute of limitations, as held in the only other appellate case on point, *In re Exxon Mobil Corp. Securities Litigation*, 500 F.3d 189, 200-01 (3d Cir. 2007). The court in *Exxon* called the two-year deadline in the first subsection a "statute of limitations"—which it would be if "violation" meant "claim" in that subsection, but we said earlier that we don't think it means that. Yet the court was troubled by the idea "that the statute of limitations begins at a different time than

the statute of repose," because this "would require the same word to have two meanings within the same statutory provision—a significant textual mountain to climb." *Id*. at 201 n. 15. It left open the possibility that it would climb the mountain if necessary, as it was not in the *Exxon* case. But the alternative, which we prefer, is that the two-year deadline, like the five-year deadline, runs from the date of the fraud rather than the date of the injury. (*Merck* also describes subsection (1) as a "statute of limitations," 130 S. Ct. at 1793, 1799, but in context was using the term as a generic label for statutes that impose deadlines for filing suit; for remember that the Court did not hold that loss or harm must occur before the period within which to file begins.)

Were it not for the practical considerations that argue compellingly against requiring proof of injury in the first subsection (the "heads I win, tails you lose" argument), it would be natural to think that subsection a statute of limitations and the second a statute of repose. For that is a common pairing, and two statutes of repose—one with a discovery provision, the other not—is uncommon, though it makes practical sense in the context of securities fraud. The dilemma identified by the Third Circuit in *Exxon* is a natural one, though we think avoidable.

But we needn't penetrate farther into this thicket, as we are not relying on subsection (1), and regarding subsection (2) the Third Circuit and we are at one. The violation in this case, defined as it should be—as the misrepresentation—occurred in August 2002, more than

five years before the suit was filed. The suit is therefore untimely.

AFFIRMED.